# IN THE SUPREME COURT OF TENNESSEE
## AT NASHVILLE
### February 6, 2002 Session

## MEMPHIS PUBLISHING COMPANY, ET AL., v.
## CHEROKEE CHILDREN & FAMILY SERVICES, INC., ET AL.

**Appeal by permission from the Court of Appeals, Middle Section**
**Circuit Court for Shelby County**
**No. CT-002141-00    John R. McCarroll, Jr., Judge**

---

**No. M2000-01705-SC-R11-CV - Filed September 5, 2002**

---

AND

## JOHN MORGAN v. CHEROKEE CHILDREN & FAMILY SERVICES, INC.

**Appeal by permission from the Court of Appeals, Middle Section**
**Chancery Court for Davidson County**
**No. 00-2419-II    Carol L. McCoy, Chancellor**

---

**No. M2000-02382-SC-R11-CV - Filed September 5, 2002**

---

These two cases, consolidated for consideration, present two issues of enormous significance. First, we must decide whether a non-profit corporation that provides privatized services to a governmental entity is subject to the public access requirements of the Tennessee Public Records Act. The second issue concerns the authority of the state, acting through the Comptroller of the Treasury, to require said corporation to submit to a state audit. In Memphis Publishing Co. v. Cherokee Children & Family Services, Inc., Memphis Publishing Company and others seek access to records belonging to Cherokee Children & Family Services, Inc., a non-profit corporation which contracted with the Tennessee Department of Human Services to help administer a state-subsidized day care program. In seeking access to the records, the plaintiffs rely on both the Tennessee Public Records Act and provisions in the contracts between the corporation and the state. In Morgan v. Cherokee Children & Family Services, Inc., the Comptroller of the Treasury, John Morgan, seeks to require the same corporation to submit to a state audit. As authority for the audit, Morgan relies upon the contracts at issue in Memphis Publishing Co. and upon 2000 Tenn. Pub. Acts. 960 (now codified at Tenn. Code Ann. § 8-4-116 (Supp. 2001)), which authorizes the Comptroller to audit the records of entities which derive fifty percent or more of their gross revenue from state or local government. The trial

courts in the two cases found that Cherokee Children & Family Services, Inc. was not a governmental agency, but that all records in its possession were state property pursuant to the contracts between it and the state. Additionally, the trial court in Morgan found that an audit was authorized by 2000 Tenn. Pub. Acts 960. The Court of Appeals reversed, holding that (1) the contractual provisions at issue did not render the records public; (2) Cherokee Children & Family Services, Inc. was not a governmental agency subject to the Public Records Act; and (3) retroactive application of 2000 Tenn. Pub. Acts 960 in Morgan would be unconstitutional. We granted permission to appeal. Because we have determined, for the reasons outlined below, that Cherokee Children & Family Services, Inc. operates as the "functional equivalent" of a governmental (state) agency, we hold that all of its records are subject to the Tennessee Public Records Act and therefore are accessible by the public. This resolution effectively resolves the audit issue, and a separate decision thereupon is unnecessary. Accordingly, the judgment of the Court of Appeals is reversed, and the cause is remanded to the trial court for further proceedings consistent with this opinion.

**Tenn. R. App. P. 11 Appeal by Permission; Judgment of the Court of Appeals Reversed**

ADOLPHO A. BIRCH, JR., J., delivered the opinion of the court, in which FRANK DROWOTA, III, C.J., E. RILEY ANDERSON, JANICE M. HOLDER, AND WILLIAM M. BARKER, JJ. joined.

Lucian T. Pera, Kathy Laughter Laizure, and Brian S. Faughnan, Memphis, Tennessee, for the appellants, Memphis Publishing Company and Mike Kerr.

Alan J. Wade, Thomas Lang Wiseman, and Lori Hackleman Patterson, Memphis, Tennessee, for the appellee, Cherokee Children & Family Services, Inc.

Paul G. Summers, Attorney General and Reporter, Michael E. Moore, Solicitor General, Albert L. Partee, III, Senior Counsel, for the appellant, John Morgan (in Morgan).

Paul G. Summers, Attorney General and Reporter, Michael E. Moore, Solicitor General, Albert L. Partee, III, Senior Counsel, and William W. Leech, Assistant Attorney General, for the appellee, Tennessee Department of Human Services (in Memphis Publishing Co.).

**OPINION**

I. Facts and Procedural History

Cherokee Children & Family Services, Inc. (Cherokee) is a non-profit public benefit corporation. Created in December 1989, its charter stated that the corporation was formed to "provide comprehensive social service." A few months after its creation, Cherokee entered into a contract with the state, operating through the Tennessee Department of Human Services (TDHS), to provide services related to child care. It then amended its charter by adding the following:

The purpose of Cherokee is to provide transitional child care services for children of low-income families referred by the Department of Human Services. Funds for this project are provided by Federal and State block grants which are used for tuition payments and administrative expenses.

The services provided by [Cherokee] include the listing and classification of child care providers, referrals of qualified families to appropriate child care centers, and the monitoring and supervision of each placement under guidelines provided by DHS. Upon the dissolution of Cherokee . . . , all remaining assets will be returned to the Federal and State offices which supplied the original grants.

Between 1990 and 2000, Cherokee contracted with TDHS to perform certain functions related to government-subsidized child care services in Shelby County. It is important to note here that Cherokee did not "care for" or "keep" children in the strictest sense. Rather, it served as a "brokering agency" that screened applicants and assisted eligible applicants in locating approved child care providers. TDHS paid the child care subsidies directly to the care centers; Cherokee, therefore, was not involved in the payment of subsidies for the child care services. Virtually all of Cherokee's operating revenue, however, came from government sources.

Over the course of dealings between Cherokee and the State, three different contracts governed their business relationship. The first contract, executed in 1990, was a grant contract under which Cherokee performed services on a cost-reimbursement basis. Prior to the commencement of any work by Cherokee, the State would approve "allowable costs" in advance, then Cherokee would spend funds to perform the work and invoice the State for reimbursement of the approved costs.

The second contract, in effect from 1992 to 1999, changed the method of payment to a fee-for-services arrangement, under which Cherokee was paid a "commission" calculated as a percentage of the funds disbursed by TDHS to day care centers as a result of Cherokee's administrative services. The money received by Cherokee under the 1992 contract was dependent only on satisfactory performance of the work and on the total funds disbursed by the State to day care services; the State disclaimed any responsibility for losses or taxes incurred by Cherokee in the performance of the contract. The contract contained a provision, however, allowing the State the right to audit Cherokee's records with respect to work performed or money received under the contract. The State routinely exercised this right by conducting regular monitoring visits and by reviewing Cherokee's client files.

Under the third and final contract, which was in effect from January 1, 2000, until its termination by the State on August 21, 2000, the parties returned to the cost reimbursement plan utilized in the 1990 contract. As in the 1992 contract, the State was allowed to audit Cherokee's records relating to work performed or money received under the contract; in addition, Cherokee was required to submit an annual independent audit to the State after each reporting period.

In late 1999, The Commercial Appeal, a daily newspaper published by Memphis Publishing Company (MPC) and serving the Memphis area, developed an interest in Cherokee's operations and asserted its right to inspect Cherokee's records pursuant to the Tennessee Public Records Act (the Act), which provides in pertinent part that "all state, county and municipal records . . . shall at all times, during business hours, be open for personal inspection by any citizen of Tennessee . . . ." Tenn. Code Ann. § 10-7-503(a) (1999 and Supp. 2001). Despite several requests and extended negotiations, Cherokee refused to tender the records. Consequently, in March 2000, MPC filed a petition seeking access to eight categories of records in Cherokee's possession.[1] MPC sought:

1. All rental agreements, leases, receipts of payments and other records related to any rental agreements between Cherokee and Affordable Homes;

2. All receipts, invoices, contracts, and other records pertaining to any and all professional and/or consulting fees paid by Cherokee since January 1, 1995;

3. Records documenting any and all payments to officers and directors of Cherokee since January 1, 1997;

4. All records, including without limitation invoices, receipts, and expense reports, documenting expenses for travel, conferences, conventions, meetings and meals since January 1, 1995, incurred and/or paid by Cherokee, as reflected in Cherokee's annual form 990 reports filed with the Internal Revenue Service;

5. All invoices, receipts, and other records detailing and documenting any or all "contributions" identified or listed in Cherokee's annual form 990 reports to the Internal Revenue Service from January 1, 1995, to the present;

6. All canceled checks and monthly statements involving all bank accounts maintained by Cherokee from January 1, 1995, to the present;

7. All invoices, receipts and any other records documenting or pertaining to rents paid by Cherokee from January 1, 1995, to the present; and

8. All contracts, consulting agreements, leases, retainers or other binding agreements entered into by Cherokee from January 1, 1990, to the present.

MPC asserted that Cherokee's records were public records subject to the Act because the terms of the contract between Cherokee and TDHS rendered the records public property. In addition, MPC asserted that because of the services Cherokee performed, it should be deemed a state agency for purposes of the Act.

---

[1] Mike Kerr, Assistant Managing Editor of The Commercial Appeal, was also a party to the petition.

During the same time that MPC was seeking access to Cherokee's records, John Morgan, the Comptroller of the Treasury,[2] notified Cherokee that the State intended to conduct an audit of Cherokee's records to investigate Cherokee's use of state-provided transportation and registration funds. Thereafter, Morgan requested "all bank records (statements, canceled checks and deposits) related to transportation fees paid to or through [Cherokee] for the period [of] September 1, 1998, through January 31, 2000." Shortly after the audit began, however, Cherokee denied the auditors further access to its bank records. After additional demands for the records were refused, Morgan filed suit in the Davidson County Chancery Court seeking a mandatory injunction requiring Cherokee to submit to the audit.

In the suit, Morgan relied upon two grounds for access to the records. First, citing the same contractual provisions relied upon by MPC in its suit, he contended that all of Cherokee's records were property of the State and that the Comptroller would have access to any documents deemed public records pursuant to the Tennessee Public Records Act. Second, Morgan contended that recently enacted legislation, 2000 Tenn. Pub. Acts ch. 960, granted the Comptroller authority, retroactive to 1992, to audit any entity which contracted with the state or local governments to provide government services and which received fifty percent or more of its gross revenue from governmental sources.[3]

---

[2]The Comptroller of the Treasury is a constitutional officer to whom the legislature has given wide-ranging duties in overseeing the use of public funds. See generally Tenn. Const. Art. VII § 3; Tenn. Code Ann. §§ 8-4-101 to -407 (1993 and Supp. 2001).

[3]Chapter 960 has since been codified at Tenn. Code Ann. § 8-4-116 (Supp. 2001). To avoid confusion, it will be referred to by the former title. Chapter 960 provides in pertinent part:

(a) Entities contracting with the state or local governments to perform government services shall be subject to audit by the comptroller of the treasury to assure that public funds are expended in accordance with the public purpose for which they were contracted.

(b) Notwithstanding any other provision of law or existing contract, the comptroller of the treasury is hereby authorized to conduct an audit of the records of any entity contracting with the State of Tennessee or local government entities . . . if such contracting entity derives fifty percent (50%) or more of its gross revenue from such state or local entity or entities. All books, records, documents, and other evidence pertaining to the receipt, accounting for, use and/or expenditure of any public funds by any such contracting entity shall be available for examination by the comptroller of the treasury during normal business hours through on-site review. In the alternative, and in the comptroller's sole discretion, such records may be provided through the mail or other methods of data transmission. Such audits shall take place as often as necessary, and to the extent necessary, in the discretion of the comptroller of the treasury and in conformance with generally accepted auditing standards, to determine whether public funds received by the entity were properly accounted for and expended in accordance with the public purpose for which the entity was contracted. The comptroller of the treasury shall have such authority notwithstanding whether the contract is in the form of a fee-for-service contract, a vendor contract, a cost reimbursement contract, any combination of these types of contract, or any other form of contract.

. . . .

(continued...)

-5-

In Memphis Publishing Co., the trial court rejected MPC's claim that Cherokee was a governmental agency, finding instead that it was an independent contractor. It further held, however, that all of Cherokee's records were the property of the State pursuant to the contracts between Cherokee and the State and that the records, therefore, were subject to access pursuant to the Tennessee Public Records Act. Similarly, the trial court in Morgan found that Chapter 960 and Cherokee's contracts with the State provided the Comptroller a summary remedy, and it ordered Cherokee to submit to an audit.

Cherokee appealed, and the Court of Appeals consolidated the cases for consideration.[4] In two opinions released together, the intermediate court reversed both trial courts' orders granting access to Cherokee's records. In Memphis Publishing Co., the appellate court agreed that Cherokee was an independent contractor, not a governmental agency. It further held, however, that the trial court's grant of access to all records in Cherokee's possession was overbroad; instead, the Court of Appeals interpreted the contractual provisions designating all of Cherokee's records as state property to refer only to records concerning work performed or money received under the contracts. In Morgan, the appellate court reiterated this narrow interpretation of the contracts between Cherokee and the State, and it held that the Comptroller could not audit Cherokee's records pursuant to Chapter 960 because application of the statute to Cherokee would amount to an unconstitutional "retrospective law, or law impairing the obligation of contracts," in violation of Article 1, § 20 of the Tennessee Constitution.

We granted permission to appeal in both Memphis Publishing Co. and Morgan. Because the facts and issues in the two cases are interconnected, we accept the cases as consolidated. After thorough review of the record and relevant authority, we hold that all of Cherokee's records are subject to access by the public and the Comptroller under the terms of the Tennessee Public Records Act. Accordingly, we reverse the judgments of the Court of Appeals. Because our holding grants the Comptroller access to the records needed for an audit through application of the Act, it is not necessary to address the constitutionality of Chapter 960 or the Comptroller's authority pursuant thereto.

II. Standard of Review

---

[3](...continued)
SECTION 2. The provisions of this act are declared to be remedial in nature and to that end shall apply to all contracts in force when this act takes effect.

The provisions of this act shall be retroactive to January 1, 1992.

[4]Memphis Publishing Co. was transferred from the Western Section of the Court of Appeals to the Middle Section. The cases were consolidated for the purpose of consideration, but the Court of Appeals directed in its order that the records of the two cases would be maintained separately and the cases would be briefed separately.

Our determination whether the Tennessee Public Records Act applies to the records in Cherokee's possession is a question of law. We review questions of law de novo with no presumption of correctness accorded to the findings of the court below. See Gleaves v. Checker Cab Transit Corp., Inc., 15 S.W.3d 799, 802-03 (Tenn. 2000); Ridings v. Ralph M. Parsons Co., 914 S.W.2d 69, 80 (Tenn. 1996). To a great extent, our holding hinges upon principles of statutory construction, for our decision whether Cherokee's records are subject to the Act is controlled by the meaning of the term "public records" as used in the Act. When interpreting a statute, "[t]he most basic principle of statutory construction is to ascertain and give effect to the legislative intent without unduly restricting or expanding [the] statute's coverage beyond its intended scope." Owens v. State, 908 S.W.2d 923, 926 (Tenn. 1995). The General Assembly has declared that the Act "shall be broadly construed so as to give the fullest possible public access to public records." Tenn. Code Ann. § 10-7-505(d) (1999). "Our . . . cases reflect the broad construction of 'record' under the Act and a consistent adherence to the policy of full public access." Tennessean v. Electric Power Bd., 979 S.W.2d 279, 301 (Tenn. 1998). Accordingly, we conduct our review de novo, and we interpret the terms of the Act liberally to enforce the public interest in open access to the records of state, county, and municipal governmental entities.

### III. Analysis

The Tennessee Public Records Act "governs the right of access to records of government agencies in this state." Cole v. Campbell, 968 S.W.2d 274, 275 (Tenn. 1998). Through its provisions, the Act serves a crucial role in promoting accountability in government through public oversight of governmental activities. Cf. Forsberg v. Hous. Auth. of Miami Beach, 455 So. 2d 373, 378 (Fla. 1984) (stating that the purpose of Florida's public records act, which is similar to Tennessee's, "is to promote public awareness and knowledge of governmental actions in order to ensure that governmental officials and agencies remain accountable to the people").

In identifying which records must be open to public inspection, the Act provides in pertinent part, "[A]ll state, county and municipal records . . . shall at all times, during business hours, be open for personal inspection by any citizen of Tennessee, and those in charge of such records shall not refuse such right of inspection to any citizen, unless otherwise provided by state law." Tenn. Code Ann. § 10-7-503(a) (1999 and Supp. 2001).[5] Little guidance is provided, however, in defining precisely which records are "state, county and municipal records" under this provision. The definition of public records in Part 3 of the Act, regarding the Public Records Commission, provides imperfect guidance, as the definitions in that part do not expressly apply to other parts of the Act:

Definitions. – As used in this part, unless the context otherwise requires:

. . . .

---

[5]Other parts of the Act provide exceptions to this broad general provision by setting forth classes of confidential records not subject to inspection. See, e.g., Tenn. Code Ann. § 10-7-504 (1999 and Supp. 2001) and statutes cross-referenced thereunder. None of these exceptions are relevant here.

(6) "Public record or records" or "state record or records" means all documents, papers, letters, maps, books, photographs, microfilms, electronic data processing files and output, films, sound recordings, or other material, regardless of physical form or characteristics made or received pursuant to law or ordinance or in connection with the transaction of official business by any governmental agency.

Tenn. Code Ann. § 10-7-301 (1999 and Supp. 2001). Nevertheless, even this definition does not identify with precision how courts should determine whether any given record has been "made or received pursuant to law or ordinance or in connection with the transaction of official business by any governmental agency."[6]

The Court of Appeals has taken a relatively narrow approach toward defining whose records should be considered subject to the Act. In Memphis Publishing Co. v. Shelby County Health Care Corp., the court addressed whether the Act allowed public access to personnel records of a not-for-profit corporation established to operate the City of Memphis Hospital. 799 S.W.2d 225, 226 (Tenn. Ct. App. 1990). The court emphasized that the corporation did not originate in the General Assembly, but instead had been incorporated under the Tennessee General Corporation Act. Id. at 229.[7] Thus, because the corporation had not been established as a governmental entity by legislative determination, the court held that it could not be considered subject to the Act regardless of its public function, public oversight, and public funding. Id. at 228-29.

In addition to the "legislative determination" approach set forth in Shelby County Health Care Corp., the Court of Appeals also has looked to agency law when determining whether records should be open to public scrutiny. In Creative Restaurants, Inc. v. City of Memphis, the court addressed whether the Act would allow public inspection of certain subleases in the possession of a private, for-profit corporation which was involved in an "urban renewal" project for the City of Memphis. 795 S.W.2d 672, 673 (Tenn. Ct. App. 1990). After outlining the complex contractual relationship between the corporation and the city, the court observed that "[w]hile the parties have been placed in the posture of lessor and lessee insofar as legal terminology is concerned, they are substantially in the posture of principal and agent." Id. at 678. This relationship, the court held, was

---

[6]Another definition of "records" appears in Part 1 of the Act, which states that the term "shall be construed to mean any records of the county legislative body and common law, circuit, criminal, or chancery court, the register's books, the surveyor's and entry taker's book, and all other public records, required by law to be kept in the several courts of this state." Tenn. Code Ann. § 10-7-101 (1999). As the Court of Appeals noted in Creative Restaurants, Inc. v. City of Memphis, however, it is evident that the definition provided by this provision was not intended to apply to other parts of the Act, and indeed, it is possible that the inclusion of that statute as part of the Act may be "a compiler's error, occurring in the renumbering of the 1980 edition of the Code." 795 S.W.2d 672, 675 (Tenn. Ct. App. 1990).

[7]The court further noted that the corporation did not claim governmental immunity from suit in tort actions and was not formally controlled by the state. Id.

sufficient under the circumstances of the case to establish the subleases as public records. Id.[8] In the case under submission, the Court of Appeals applied an agency analysis similar to that used in Creative Restaurants, Inc. to conclude that Cherokee was an independent contractor and not an agent of the State.

Our review of relevant authority, however, leads us to conclude that the law of agency is not the ideal vehicle for determining whether records in the possession of a given private entity should be subject to public scrutiny under the Act. The difficulty with the agency analysis arises because of the growing trend toward privatization of governmental functions and services.

Since the 1980s, governmental entities in various parts of the nation have looked increasingly to privatization as a possible solution to perceived problems of inefficiency or expense in the provision of public services. See generally Craig D. Feiser, Protecting the Public's Right to Know: The Debate Over Privatization and Access to Government Information Under State Law, 27 Fla. St. U.L. Rev. 825, 825-27 (2000). In typical privatization arrangements, the government, through a contract or similar vehicle, delegates to a private entity the responsibility for performing a function formerly performed by the government itself.[9] The arrangement between Cherokee and the State in the case under submission involves "[t]he most common form of privatization, called 'contracting out,' [in which] the government contracts with a private entity to provide a service previously performed by the government, or to provide a service for or on behalf of a government entity." See Feiser, supra, at 829.

Scholars have long debated the merits of privatization policies. Compare Joseph Caponio and Janet Geffner, Does Privatization Affect Access to Government Information?, 5 Gov't Info. Q. 147 (1998) (describing privatization as an efficient management tool when used properly); with Shirley L. Mays, Privatization of Municipal Services: A Contagion in the Body Politic, 34 Duq. L. Rev. 41 (1995) (asserting that "governments cannot turn over operation of essential government services to private companies without abusing the trust of its citizens and putting them at risk"). Only recently, however, has attention focused upon the ways in which public access to information may be obstructed when governmental functions are transferred to the private sector. As one commentator states, "Privatization may be desirable in itself, but it should not come without . . . leaving public accountability intact. Not only should the public be able to monitor the private company's activities, but the monitoring should be on the same terms as when the public agency was the information vendor." Feiser, supra, at 833. Others note that the government may, intentionally or unintentionally, shield records from the public by shifting them to private entities. Indeed, by maintaining and controlling previously public records, private companies may control public access to such records in ways that are "at odds with the very purpose of public records laws." Matthew Bunker and Charles Davis, Privatized Government Functions and Freedom of Information: Public

---

[8] In addition, the court held, for similar reasons, that documents in the hands of a part-time city attorney were public records because the attorney was the city's agent. Id. at 678-79.

[9] For an overview of how privatization arrangements function, see generally E.S. Savas, Essay: Privatization and the New Public Management, 28 Fordham Urb. L.J. 1731 (2001).

Accountability in an Age of Private Governance, 75 Journalism and Mass Comm. Q. 464, 464-68 (1998).

Numerous other jurisdictions have examined how public records laws should apply in a climate of increased privatization to ensure that public access, and hence governmental accountability, is preserved. One widely-used approach, pioneered by the Connecticut Supreme Court, balances several factors to determine whether a given private entity's records should be open to public inspection. See, e.g., Connecticut Humane Soc'y v. Freedom of Info. Comm'n, 591 A.2d 395, 397 (Conn. 1991). In Connecticut Humane Society, the court defined the term "public agency" in state public records laws[10] to include a private entity "that is the functional equivalent of a public entity." Id. at 396-97. The court stated:

> In determining whether an entity is the functional equivalent of a public agency, we consider the following criteria: (1) whether the entity performs a governmental function; (2) the level of government funding; (3) the extent of government involvement or regulation; and (4) whether the entity was created by the government.

Id. at 397 (internal quotations omitted). The court stressed that no single factor was dispositive to this case-by-case analysis, asserting that "[i]n light of the myriad of organizational arrangements that may be confronted, under the functional equivalency approach, 'each new arrangement must be examined anew and in its own context.'" Id. (quoting Washington Research Project, Inc. v. Department of Health, Educ. & Welfare, 504 F.2d 238, 245-46 (D.C. Cir. 1974)).

A similar analysis has been applied in Maryland. See Abell Publ'g Co. v. Mezzanote, 464 A.2d 1068, 1074 (Md. 1983). In Mezzanote, the Court of Appeals of Maryland held that a non-profit insurance guaranty association was subject to Maryland's public records statute, whose terms encompassed records made by "any branch of the State government, including the legislative, judicial, and executive branches, by any branch of a political subdivision, and by *any agency or instrumentality of the State* or a political subdivision." Id. at 1069 (quoting Md. Code, Art. 76A § 1(b) (emphasis added)).[11] In reaching its conclusion, the court rejected the contention that an entity was subject to public records laws only if it were under complete control by the state. Id. at 1072. Rather, the court proposed "a number of factors" to decide whether the private entity's records should be subject to public access, including the public purpose of the private entity, the "degree of

---

[10]Pertinent provisions of Connecticut's Freedom of Information Act mandated that public agencies provide schedules of their meetings to members of the public upon request. See Connecticut Humane Soc'y, 591 A.2d at 396 n.2 (quoting Conn. Gen. Stat. § 1-21c). Additional portions of the Act defined "public agency" to include "any executive, administrative or legislative office of the state or any political subdivision of the state and any state or town agency, any department, institution, bureau, board, commission, authority, or official of the state . . . ." Id. at 396 (quoting Conn. Gen. Stat. § 1-18a(a)).

[11]Maryland's Public Information Act, like Tennessee's Public Records Act, provides that its provisions "shall be broadly construed in every instance with the view toward public access." Md. Code, Art. 76A, § 1A, quoted in Mezzanote, 464 A.2d at 1071.

control exercised by" the government over the entity, whether the entity was created by statute, and whether the entity was immune from tort liability. Id. at 1072-74. While the language used by Maryland's Court of Appeals was not identical to that of the Connecticut Supreme Court, its inquiry, in essence, amounted to the same "functional equivalency" analysis.

Other states, including North Carolina, Oregon, Kansas, and Florida, also have used comparable approaches in deciding whether public records statutes should apply to certain private entities performing government functions. See News and Observer Publ'g Co. v. Wake County Hosp. Sys., Inc., 284 S.E.2d 542, 544-49 (N.C. Ct. App. 1981); Marks v. McKenzie High School Fact-Finding Team, 878 P.2d 417, 424-26 (Or. 1994); Kan. Op. Att'y Gen. 93-130 (1993), available at 1993 Kan. AG LEXIS 116; see also News and Sun-Sentinel Co. v. Schwab, Twitty & Hanser Architectural Group, 596 So. 2d 1029, 1031 (Fla. 1992); Feiser, supra, 837-44 (discussing these cases).[12] Federal courts applying the Freedom of Information Act also have favorably discussed the functional equivalency analysis. See Ry. Labor Executives' Ass'n v. Consol. Rail Corp., 580 F. Supp 777, 778-79 (D.D.C. 1984).

Our review of authority from other jurisdictions persuades us that the functional equivalency approach described above provides a superior means for applying public records laws to private entities which perform "contracted out" governmental services. As the facts of these cases demonstrate, private entities that perform public services on behalf of a government often do so as independent contractors. Nonetheless, the public's fundamental right to scrutinize the performance of public services and the expenditure of public funds should not be subverted by government or by private entity merely because public duties have been delegated to an independent contractor. When a private entity's relationship with the government is so extensive that the entity serves as the functional equivalent of a governmental agency, the accountability created by public oversight should be preserved.

---

[12]Florida should be distinguished from the other jurisdictions discussed above because the terms of its public records statute explicitly extend to private entities "acting on behalf of a public agency." News and Sun-Sentinel Co., 596 So. 2d at 1031 (quoting Fla. Stat. § 119.011(2)). The factors used by Florida courts in determining whether a private entity is acting on behalf of a public agency, however, are notable:

> The factors include, but are not limited to: 1) the level of public funding; 2) commingling of funds; 3) whether the activity was conducted on publicly owned property; 4) whether services contracted for are an integral part of the public agency's chosen decision-making process; 5) whether the private entity is performing a governmental function or a function which the public agency otherwise would perform; 6) the extent of the public agency's involvement with, regulation of, or control over the private entity; 7) whether the private entity was created by the public agency; 8) whether the public agency has a substantial financial interest in the private entity; and 9) for [whose] benefit the private entity is functioning.

Id.

Consequently, in light of our duty to construe the Tennessee Public Records Act liberally in favor of "the fullest possible public access to public records,"[13] we follow the Connecticut Supreme Court and interpret records "made or received . . . in connection with the transaction of official business by any governmental agency" to include those records in the hands of any private entity which operates as the functional equivalent of a governmental agency.[14] In making this determination, we look to the totality of the circumstances in each given case, and no single factor will be dispositive. The cornerstone of this analysis, of course, is whether and to what extent the entity performs a governmental or public function, for we intend by our holding to ensure that a governmental agency cannot, intentionally or unintentionally, avoid its disclosure obligations under the Act by contractually delegating its responsibilities to a private entity. Beyond this consideration, additional factors relevant to the analysis include, but are not limited to, (1) the level of government funding of the entity; (2) the extent of government involvement with, regulation of, or control over the entity; and (3) whether the entity was created by an act of the legislature or previously determined by law to be open to public access.

We caution that our holding clearly is not intended to allow public access to the records of every private entity which provides any specific, contracted-for services to governmental agencies. A private business does not open its records to public scrutiny merely by doing business with, or performing services on behalf of, state or municipal government. But when an entity assumes responsibility for providing public functions to such an extent that it becomes the functional equivalent of a governmental agency, the Tennessee Public Records Act guarantees that the entity is held accountable to the public for its performance of those functions.

Having set forth the "functional equivalency" test, we next must apply that analysis to the case under submission. Most critically, the services performed by Cherokee, providing child care services for indigent families and supervising child care placements under TDHS guidelines, were undeniably public in nature. Indeed, the record reflects that TDHS directly performed these services prior to entering into the contracts with Cherokee. Cherokee's involvement in providing these services was extensive, with all of its employees performing services under the contracts with TDHS. Indeed, because Cherokee's business activities were, by its charter, dedicated exclusively to the servicing of the TDHS contracts, all of its records necessarily relate to its state business. Moreover, Cherokee's operation was financed with public funds (over ninety-nine percent of its funding came from governmental sources). In addition, although TDHS did not exercise complete control or supervision over Cherokee, a significant level of governmental control and oversight is evidenced by the provisions in the 1992 and 1999 contracts requiring advance State approval of "allowable costs" under the contracts and the provisions in all three contracts authorizing State audits of Cherokee's activities. While it is true that: (1) Cherokee was privately incorporated rather than created by the legislature; (2) the contracts disavowed any agency relationship between Cherokee

---

[13]See Tenn. Code Ann. § 10-7-505(d) (1999).

[14]We emphasize that our rationale is driven by our interpretation of the term "public records" in the Tennessee Public Records Act and by considerations unique to the policies furthered by the Act. Hence, our decision has no bearing upon other areas of the law involving governmental entities.

and the State; and (3) the parties asserted that the State incurred no tort liability for Cherokee's activities, these considerations are outweighed by the other factors listed above. Accordingly, we conclude that Cherokee served as the functional equivalent of a governmental agency, and so we hold that the records in Cherokee's possession are subject to public access pursuant to the terms of the Tennessee Public Records Act. It follows, furthermore, that the Comptroller may have the same access as the public to Cherokee's records under the terms of the Act. Our holding renders it unnecessary for us to reach the other issues raised by the parties, including the constitutionality of Chapter 960, and we express no opinion on those issues.[15]

## IV. Conclusion

For the foregoing reasons, we hold that Cherokee's status as the functional equivalent of a governmental agency is sufficient to place it within the scope of the Tennessee Public Records Act. Accordingly, records in Cherokee's possession shall be subject to inspection by MPC and the Comptroller pursuant to the terms of the Act, and we remand the cause to the trial court for further proceedings consistent with this opinion. Costs on appeal are taxed to Cherokee Children & Family Services, Inc., for which execution may issue if necessary.

_____
ADOLPHO A. BIRCH, JR., JUSTICE

---

[15]Additionally, MPC asserts in its brief that attorney's fees and costs should be assessed against Cherokee because it "clearly refused to provide access to certain records it knew were public records subject to the access requirements of the Tennessee Public Records Act." Under the Act, the decision whether to award attorney's fees is left to the discretion of the trial court; consequently, we will not disturb that decision absent clear evidence of an abuse of that discretion. Tenn. Code Ann. § 10-7-505(g) (1999); see also Aaron v. Aaron, 909 S.W.2d 408, 411 (Tenn. 1995) ("The allowance of attorney's fees is largely in the discretion of the trial court, and the appellate court will not interfere except upon a clear showing of abuse of that discretion."). In the case under submission, the trial court denied attorney's fees, stating, "Because this decision involved a complex interpretation of controlling case law and contractual language, Cherokee's refusal to turn over documents to [MPC] cannot be deemed willful." Based on our review of the record, we conclude that the trial court did not abuse its discretion in so holding, and therefore we affirm.

-13-