Prison Legal News v. Corrections Corp. of Am., No. 332-5-13 Wncv (Bent, J. Jan. 10, 2014).

[The text of this Vermont trial court opinion is unofficial. It has been reformatted from the original. The accuracy of the text and the accompanying data included in the Vermont trial court opinion database is not guaranteed.]

## STATE OF VERMONT

SUPERIOR COURT                                        CIVIL DIVISION
Washington Unit                                        Docket No. 332-5-13 Wncv

Prison Legal News
         Plaintiff


         v.


Corrections Corporation of America
         Defendant


Decision re: CCA's Motion to Dismiss


This suit was brought by Plaintiff Prison Legal News (PLN) seeking an order compelling Defendant Corrections Corporation of America (CCA) to comply with PLN's request for public records under Vermont's Access to Public Records Act, 1 V.S.A. §§ 315–320. CCA confines certain Vermont prisoners in out-of-state facilities under contract with the Vermont Department of Corrections (DOC). CCA seeks dismissal of this case arguing that, as a private entity, it is not subject to the Act. PLN opposes dismissal arguing that CCA is subject to the Act as the functional equivalent of a public agency. PLN is represented by the ACLU Foundation of Vermont through Dan Barrett, Esq. CCA is represented by Jennifer Mihalich, Esq.


CCA has stipulated to this court's personal jurisdiction over it. Its dismissal motion is asserted under both Rules 12(b)(1) (lack of subject matter jurisdiction) and 12(b)(6) (failure to state a claim). The court held an evidentiary hearing the scope of which was narrow and intended to allow the court to learn more about CCA. PLN objected to the hearing. The objection is moot. The parties have presented to the court and fully briefed a pure issue of law that the court now decides based on the allegations of the complaint and its attachments.[1] The question is whether the Act applies to CCA. CCA has asserted that if the Act applies to it, then certain exemptions from access also

---

[1] CCA's motion is probably better characterized as arguing a failure to state a claim rather than a lack of subject matter jurisdiction. Theoretically, the court could deny the motion simply to let a novel claim unfold. However, the issue is fully briefed, purely legal, and both parties ask the court to decide it. PLN's complaint (with attachments) paint a clear picture of CCA's role vis-à-vis Vermont prisoners and the DOC, and CCA does not suggest that the record needs development before the legal question may be answered. There is no reason to not address it now.

may apply to the particular records requested. 1 V.S.A. § 317(c) (listing numerous exemptions from public access). That matter is not before the court at this time.

*Background*

PLN is "a nationwide, monthly publication dealing with prisoner rights, prisoner litigation, and prison conditions." It is published by the Human Rights Defense Center, which is headquartered in West Brattleboro, Vermont. CCA is a for-profit, publicly traded Maryland corporation headquartered in Tennessee in the business of operating prisons.

CCA has entered into a contract with the DOC by which it has been and is required to undertake numerous prison-related services for the DOC in relation to the Vermont prisoners sent to it. These include inmate "care and treatment; furnishing subsistence and all necessary routine medical care; providing for their physical needs; making programs of training and treatment consistent with inmates' needs available; retaining the inmates in safe, supervised custody; maintaining proper discipline and control; [and] making certain that sentences and orders of the committing court . . . are faithfully executed." Complaint ¶ 12. The contract itself spells out in more detail what responsibilities CCA undertakes with respect to Vermont inmates. In short, CCA has contractually bound itself to be an out-of-state jailor for the State of Vermont. There is no meaningful distinction between what CCA does under contract for Vermont prisoners sent out-of-state and what the DOC does for in-state prisoners.

It is clear that, while housed in a CCA facility, Vermont prisoners are subject to the daily control of CCA, not the DOC. See generally Attachment "G" (Inmate Housing Agreement) to the Contract between CCA and the DOC. CCA is required to provide information to the DOC about the prisoners while in CCA's care, including disciplinary activity, grievances, inmate injuries, escapes or deaths, UA results, results of a required "shakedown" program, prison rape statistics, and other information about the inmates. It is also required to keep the DOC notified of lawsuits filed by Vermont inmates. "It is required to notify the state 'within 10 days of receiving any claim for damages, notice of claims, pre-claims, or service of judgments or claims, for any act or omission'" occurring in the performance of the contract. Complaint ¶ 18.

Other aspects of the contract include the following. Payment for prison bed space is based on a daily rate of, currently, approximately $65 per day for the Lee Adjustment

2

Center facility in Beattyville, KY and about $72 per day at the Florence Correctional Center. App. E 26. CCA must maintain a grievance policy and, for grievances to the warden or higher authority, the DOC is allowed input. Copies of all grievances (formal and informal) are provided to the DOC. App. E 24. CCA has physical control and the power to exercise disciplinary authority over all inmates subject to a delineated reasonableness standard. App. E 22–23. Vermont inmates are intended to be kept together at the Lee Adjustment Center although they may be housed with non-Vermont inmates. App. E 17. Vermont inmates shall not be relocated from Lee so long as the DOC uses at least 95% of an allocated 400 beds on a continual basis. App. E 18. The Vermont Staffing Pattern references 550 Beds for Vermont Inmates at Lee. App. E 51. The court's understanding is that Lee currently houses Vermont prisoners only and CCA is looking to fill additional space with inmates from elsewhere.[2] The Florence facility has a 40-unit pod available for higher security level Vermont prisoners. App. E 17. It has a capacity of 1,900 beds, 1,860 of which are used for federal prisoners. App. E 47. CCA and the DOC have agreed that CCA is an independent contractor and "Neither [CCA] nor any agent or employee of [CCA] shall be or shall be deemed an agent or employee of the State of Vermont." App. E 43.

Taking the position that CCA is subject to Vermont's Access to Public Records Act, PLN sent a letter dated September 10, 2012 to CCA requesting the following:

> All records related to any payments made by any entity to any claimants or their attorneys pursuant to judgments against, or settlements with, the State of Vermont (or any of its agencies) and/or [CCA] in connection with services provided to the [DOC] by CCA. Your response should include, but not be limited to: (a) for each judgment and/or settlement, the most recent claim or complaint or amended complaint detailing the legal demand; (b) all settlement agreements, releases and documents related to disbursement of settlement funds; (c) any record of the imposition of sanctions by a court, and payment thereof; and (d) if payment was made pursuant to a judgment, the jury verdict and/or findings of fact and conclusion of law forming the basis for the judgment.

Complaint ¶ 23 (filed May 31, 2013). Taking the position that it is not subject to the Act, CCA did not respond to PLN's request. PLN "appealed" in writing to CCA's general

---

[2] The maximum potential number of prisoners at Lee is unknown, but it is apparent that Lee may house inmates from other jurisdictions.

counsel, which also did not respond.  PLN then filed this suit.

CCA seeks dismissal arguing that it is a private entity, not a public agency subject to the Act.  PLN asserts that CCA has assumed the role of a public agency within the meaning of the Act by substituting itself for the DOC in the housing and care of Vermont prisoners.  In this litigation, PLN seeks a declaration that CCA is subject to the Act and the requested records are public records, an order requiring production of those records, and legal fees pursuant at 1 V.S.A. § 319(d)(1).[3]

*Analysis*

The Access to Public Records Act reflects the strong policy preference for the "free and open" examination of public records.  1 V.S.A. § 315.  It is based on the "fundamental principle of open government that public officials 'are trustees and servants of the people and it is in the public interest to enable any person to review and criticize their decisions.'"  *Price v. Town of Fairlee*, 2011 VT 48, ¶ 13, 190 Vt. 66 (quoting 1 V.S.A. § 315).  The Act "shall be liberally construed to implement this policy."  1 V.S.A. § 315.

The fundamental right and duty that are the heart of the Act appear in 1 V.S.A. § 316(a): "Any person may inspect or copy any public record of a public agency."  A public record is "any written or recorded information . . .  which is produced or acquired in the course of public agency business."  1 V.S.A. § 317(b).  A public agency is "any agency, board, department, commission, committee, branch, instrumentality, or authority of the State or any . . . political subdivision of the State."  *Id*. § 317(a)(2).

CCA takes a literalistic, categorical approach to the definition of public agency.  In its view, the definition of "public agency" describes several discrete types of entities all of which have traditional, formal governmental meanings.  It, on the other hand, is a private entity to which none of those concepts apply, at least when narrowly construed.  The Act, it concludes, thus does not apply to it.  It also suggests that certain procedural aspects of the Act also do not fit a private entity such as itself, ostensibly confirming that

---

[3] The attorney fee provision appears at 1 V.S.A. § 319(d)(1).  It is intended to encourage agencies to respond to records requests promptly and properly and to eliminate any inducement to wrongly withhold publicly accessible information from those who are unable to afford an attorney or otherwise compel production.  It does not in any way appear to be intended to surprise a private entity that reasonably did not know that it is subject to the Act in the first place with the burden of a potentially quite significant financial loss.  The court is highly doubtful that it could be reasonably interpreted to apply to the litigation of this case thus far.  However, the parties have not briefed the applicability of the fee provision so the court will not now determine its scope.

the legislature did not intend the definition of public agency to extend to private entities.

PLN broadly construes the definition of "public agency" to include some private entities, such as CCA, as instrumentalities of the State (or authorities of it). More generally, PLN argues that the definition of "public agency" is broad enough to include both traditional governmental entities as well as private entities to the extent that they have undertaken roles revealing them as the functional equivalent of public agencies.

CCA's argument has some appeal on its face. If accepted, however, it would have an anomalous and disturbing consequence: it would enable any public agency to outsource its governmental duties to a private entity and thereby entirely avoid, intentionally or unintentionally, the fundamental interests in transparency and accountability that the Act is designed to protect and that has become a normalized quality and function of government.[4]

The collision between the trend toward outsourcing (contracting out) governmental functions to the private sector and the fundamental importance of "right to know" laws is not completely uncharted territory. See generally Craig D. Feiser, Protecting the Public's Right to Know: The Debate Over Privatization and Access to Government Information under State Law, 27 Fla. St. U. L. Rev. 825 (2000) (briefly describing the conflict between privatization and public accountability and classifying numerous approaches taken by different courts). The collision presents particularly acute issues in the case of outsourcing such uniquely governmental functions as the imprisonment of inmates.[5] See generally Stephen Raher, The Business of Punishing: Impediments to Accountability in the Private Corrections Industry, 13 Rich. J.L. & Pub. Int. 209 (2010) (describing the history of privatized prisons and some of the complications arising out of the non-governmental status of such operators, including, at 236–47, impediments to transparency).

The concept of functional equivalence in the public records context emerged in federal cases in the 1970s, including *Washington Research Project, Inc. v. Dep't of*

---

[4] Interest in governmental transparency and accountability obviously preceded the wave of legislative "right to know" enactments across the country in the 1970s, including the adoption of Vermont's Access to Public Records Act in 1976. 1975, No. 231 (Adj. Sess.). One can only speculate as to how the common law (or constitutional law) would have developed by now had legislatures never so acted. What seems clear enough is that the interest in governmental transparency has only become more intense over the years while the broad legitimacy of that interest has become bedrock to the very structure of American government itself.

[5] The issues would seem to be as acute in the context of the involuntary hospitalization of mentally ill patients in privately operated facilities.

*Health, Educ. & Welfare,* 504 F.2d 238 (D.C. Cir. 1974). In *Washington Research Project*, in pertinent part, the court needed to determine under FOIA whether certain requested records were subject to disclosure as the final opinions of an agency or not subject to disclosure as intra-agency memoranda. *Id*. at 245. To do so, it needed to determine whether independent research groups (IRGs) to which the National Advisory Mental Health Council had referred grant applications for consideration was an "agency." The definition of agency at issue included "each authority of the Government of the United States, whether or not it is within or subject to review by another agency." *Id*. The court explained that "The generality of this definition" necessitated "an elaboration along more functional lines than the phrase 'each authority' conveys," but that "any general definition can be of only limited utility to a court confronted with one of the myriad organizational arrangements for getting the business of the government done." *Id*. at 246–47. "The unavoidable fact is that each new arrangement must be examined anew and in its own context." *Id*. at 247. The court characterized the IRGs as consultants and explained that they could not be elevated "to the status of the agency for which they work unless they become the functional equivalent of the agency." *Id*. at 248. On the facts at hand, the court concluded that the IRGs were not the functional equivalent of the agency.

In *Board of Trustees of Woodstock Academy v. Freedom of Information Commission*, 436 A.2d 266 (Conn. 1980), the Connecticut Supreme Court had to determine whether a "nominally private corporation which serves a public function may be considered a public agency for purposes of" Connecticut's public records act. *Id*. at 269. The Court rejected the "formalistic arguments of the sort advanced by the plaintiff who seeks to make determinative the academy's nominal status as a private nonstock corporation." *Id*. at 270. Instead, it sifted federal "functional equivalency" cases, including *Washington Research Project*, to isolate the following factors for analysis: "(1) whether the entity performs a governmental function; (2) the level of government funding; (3) the extent of government involvement or regulation; and (4) whether the entity was created by the government." *Id*. at 270–71. The Court emphasized that "A case by case application of the factors noted above is best suited to ensure that the general rule of disclosure underlying this state's FOIA is not undermined by nominal appellations which obscure functional realities." *Id*. at 271. Ultimately, it concluded that, on the facts presented, the Academy was the functional equivalent of a public agency for access-to-public-records purposes.

On different facts, the Connecticut Court revisited the subject matter in

6

*Connecticut Humane Society v. Freedom of Information Commission*, 591 A.2d 395 (Conn. 1991). The Court rejected the intermediate court's analysis, which required the presence of *all* factors isolated in *Woodstock Academy*. It explained instead that "All relevant factors are to be considered cumulatively, with no single factor being essential or conclusive." *Id*. at 397 (quoting *Railway Labor Executives' Assn. v. Consolidated Rail Corporation*, 580 F.Supp. 777, 778 (D.D.C. 1984)). The society performed a governmental function in one sense. *Connecticut Humane Society*, 591 A.2d at 399. However, other circumstances did not fit to reveal it as the functional equivalent of a public agency.

The Tennessee Supreme Court picked up on this line of authority in *Memphis Publishing Co. v. Cherokee Children & Family Services*, 87 S.W.3d 67 (Tenn. 2002). The Court described the relevant issue presented as having "enormous significance": "whether a non-profit corporation that provides privatized services to a governmental entity is subject to the public access requirements of the Tennessee Public Records Act." *Id*. at 70. Cherokee operated as a "'brokering agency' that screened applicants and assisted eligible applicants in locating approved child care providers" under contract with the State. *Id*. at 71. The basic insight of the Tennessee Court is this:

> [T]he public's fundamental right to scrutinize the performance of public services and the expenditure of public funds should not be subverted by government or by private entity merely because public duties have been delegated to an independent contractor. When a private entity's relationship with the government is so extensive that the entity serves as the functional equivalent of a governmental agency, the accountability created by public oversight should be preserved.

*Id*. at 78–79. The *Cherokee* Court thus adopted the functional equivalency analysis (and four factors) described in the Connecticut cases. *Id*. at 79. It added, however, that the first factor—public function—is the most important.

> The cornerstone of this analysis, of course, is whether and to what extent the entity performs a governmental or public function, for we intend by our holding to ensure that a governmental agency cannot, intentionally or unintentionally, avoid its disclosure obligations under the Act by contractually delegating its responsibilities to a private entity.

*Id*.  On the facts presented, the Court concluded that Cherokee was the functional equivalent of a governmental agency and thus subject to public disclosure requirements.

A subsequent case before the Tennessee Court of Appeals is of particular interest. In *Friedmann v. Corrections Corp of America*, 310 S.W.3d 366 (Tenn. Ct. App. 2009), the court concluded that CCA's operation of certain Tennessee prisons made it the functional equivalent of a governmental agency and thus subject to public disclosure laws.  The plaintiff, Alex Friedmann, at least at the time, was an associate editor of Prison Legal News, presumably the same Prison Legal News that is the plaintiff in this case. *Friedmann* did not particularly advance the state of the law on functional equivalency and, factually, the case has wrinkles not present here.  However, *Friedmann* is significant to the extent that the court based its functional equivalency analysis nearly exclusively on the governmental function factor.  See *id*. at 375 ("With all due respect to CCA, this Court is at a loss as to how operating a state prison could be considered anything less than a governmental function."), 376 ("In short, we conclude, without difficulty, that . . . CCA is operating that facility as the functional equivalent of a state agency pursuant to the analysis set forth in *Cherokee*.").  "The providing of prisons is a responsibility that the State cannot delegate to a private entity.  While the State can contract with a private entity such as CCA to operate a prison . . ., the ultimate responsibility to provide for its prisoners belongs to the State."  *Id*. at 376; see also *id*. at 379 (extending the same analysis to other prisons CCA operates for county or other local Tennessee governments).

Particularly with these authorities in mind, the court does not find the operative language of Vermont's Access to Public Records Act so obvious as CCA does.  On its face, the definition of "public agency" is self-contained; it does not expressly refer to other defined terms.  "Public record," however, expressly includes the expression "public agency": a public record is "any written or recorded information . . . *which is produced or acquired in the course of public agency business.*"  1 V.S.A. § 317(b) (emphasis added).  The concepts thus are intrinsically tethered together; they give each other meaning.  A public record is not simply one produced by a public agency (which would place the emphasis on the entity), it includes any record produced in the course of agency business (focusing attention on the nature of the undertaking).  The definition of public agency does not appear to be intended as a limitation on the meaning of "public record." It does not draw distinctions between agencies subject to the Act and agencies not subject to the Act.  It attempts instead to inclusively describe entities that routinely produce or acquire public documents in the course of their business.  It thus has a functional component.  The fundamental question, then, is whether any particular entity sufficiently

8

produces or acquires public documents in the course of its business or, more simply, whether the entity sufficiently undertakes agency business to be considered subject to the Act.

CCA argues, however, that other parts of the Act clearly do not apply to a private entity such as itself and that this reflects the legislature's intent to not so apply the Act. CCA argues, for instance, that the Act is designed to allow the review and criticism of the decisions of governmental officers whereas its employees are not governmental officers. The Act contemplates that a member of the public may walk into an agency's Vermont office to inspect records whereas it has no such Vermont office. The Act contemplates that fees associated with responding to requests are set by the Secretary of State (in the case of State agencies) and are deposited in the general fund. Political subdivisions may set fees only after a public hearing. All of these, CCA argues, are concepts that do not apply to private entities. Moreover, it has no "head of the agency" to which an appeal may be taken. According to CCA, these and other provisions of the Act make clear that the legislature did not intend the Act to apply to a private entity.

The court is not persuaded by this argument. None of the provisions to which CCA cites in any apparent way is intended to modify the definitions of "public agency" and "public record" or limit the right and duty broadly expressed in 1 V.S.A. § 316(a). If anything, to the extent that those provisions do not meaningfully apply to CCA, they may indicate that the legislature did not *expressly* contemplate the Act's applicability to a private entity when the statute was enacted. This would not be surprising considering the immature state of governmental outsourcing in the 1970s. However, the fact that a statute applies "in situations not expressly anticipated by" the legislature merely "demonstrates breadth." *Sedima, S.P.R.L. v. Imrex Co., Inc.*, 473 U.S. 479, 499 (1985) (quoting *Haroco, Inc. v. American Nat. Bank and Trust Co. of Chicago*, 747 F.2d 384, 398 (7th Cir. 1984)). It does not limit the reach of the statute. Here, the Act may simply include provisions that do not apply in this context.[6] It does not, however, depend on those provisions for its meaning.

The court predicts that the Vermont Supreme Court, to the give the Act the meaning it is intended to have, would construe it to reach private entities that are the functional equivalent of a public agency and the records that are within the scope of that equivalency. The court further predicts that it would adopt a functional equivalency test along the lines of the analysis that has developed in Connecticut and Tennessee. The

---

[6] Whether this is actually so with regard to any particular provision is not now at issue.

court thus adopts that analysis for purposes of this case. The question then becomes whether CCA is the functional equivalent of a public agency subject to the Act in the circumstances of this case. The non-exclusive factors are: (1) whether the entity performs a governmental function; (2) the level of government funding; (3) the extent of government involvement or regulation; and (4) whether the entity was created by the government.

CCA operates 60 facilities nationwide. The bulk of Vermont inmates are at the Lee Adjustment Center in Kentucky. Currently, that facility houses Vermont inmates only. However, it has capacity for others and the court presumes that CCA would house inmates from other governmental jurisdictions. In the *Friedmann* case, CCA was operating prisons for the State of Tennessee and other local governmental entities and all of the prisons apparently were located in Tennessee. It is not clear to the court, however, that the Kentucky location of the facility housing Vermont inmates is particularly material to the analysis. There is no question that the court has personal jurisdiction over CCA: CCA has stipulated to it.

Vermont's payments to CCA are based on a per diem charge. They cover housing in a CCA prison, food, clothing, security, heat, utilities, insurance, etc. Vermont did not create CCA and CCA is by no means wholly dependent on Vermont. Vermont provides one income stream to CCA against which CCA pays expenses and draws whatever profit it enjoys. CCA presumably would carry on its business without Vermont's business. On the other hand, in absolute terms, the amount of public funds paid to CCA annually is significant, many millions. According to the complaint, the DOC has paid CCA well over $70 million since 2007.

CCA does not enjoy any governmental immunity and under its contract with the DOC it is required to indemnify the State for claims against the State stemming from its housing of Vermont prisoners.

The Vermont Department of Corrections has the contractual authority to closely monitor CCA's actions with its inmates. The contract between CCA and Vermont establishes standards of care of the inmates. App. E 22–23. The DOC is required to be notified of all significant discipline of prisoners as well as injuries to them and claims made by prisoners. While the day-to-day operation of the jail is given over to CCA, it is clear enough that Vermont is heavily involved in non-mundane details (which include the details sought by the PLN).

10

Together, the circumstances above are not sufficient to persuade the court that CCA is the functional equivalent of a public agency for purposes of the Access to Public Records Act. However, the "cornerstone" of the analysis is the first factor—whether and to what extent the entity performs a governmental or public function. Imprisonment is one of the most intrinsically governmental of functions. CCA holds Vermonters in captivity; disciplines them; pervasively regulates their liberty, and carries out the punishment imposed by the sovereign. These are uniquely governmental acts. CCA could have no lawful basis for such an undertaking except on authority of a government. It is no ordinary government contractor.

The DOC's fundamental purpose is set forth in 28 V.S.A. § 1(a):

The [DOC] . . . shall have the purpose of developing and administering a correctional program designed to protect persons and property against offenders of the criminal law and to render treatment to offenders with the goal of achieving their successful return and participation as citizens of the state and community, to foster their human dignity and to preserve the human resources of the community.

The DOC is authorized to contract with third parties to assist in the exercise of its functions, including the placement of Vermont prisoners in out-of-state prisons. 28 V.S.A. §§ 101(8), 102(b)(5), 102(c)(20). The DOC is not, however, authorized to delegate away its responsibility. The governmental function factor clearly elevates CCA, to the extent of its involvement in the imprisonment of Vermonters, to the status of a public agency under the Act.

The transparency and public accountability provided by the Access to Public Records Act attends the relationship between CCA and the DOC.

11

*Order*

CCA's motion to dismiss is denied.  This case is to be scheduled for a status conference to determine what further proceedings are required.

Dated at St. Johnsbury, Vermont on January 9, 2014.

_____
Robert R. Bent,
Judge