IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
June 9, 2009 Session

## THOMAS M. GAUTREAUX v. INTERNAL MEDICINE EDUCATION FOUNDATION, INC.

**Appeal from the Chancery Court for Hamilton County**
**No. 08-0008      Howell N. Peoples, Chancellor**

---

**No. E2008-01473-COA-R3-CV  - FILED OCTOBER 30, 2009**

---

This case[1] involves the interpretation of a portion of the Tennessee Public Records Act, Tenn. Code Ann. § 10-7-503. The trial court found that despite the fact the defendant foundation qualified for the statutory exemption set forth in Tenn. Code Ann. § 10-7-503(d)(1), the entity is subject to the Tennessee Public Records Act because it is the functional equivalent of a public agency. The foundation has appealed. We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court**
**Affirmed; Case Remanded**

JOHN W. MCCLARTY, J., delivered the opinion of the court, in which HERSCHEL P. FRANKS, P.J., joined. CHARLES D. SUSANO, JR., J., filed a dissenting opinion.

Frederick L. Hitchcock and Douglas S. Griswold, Chattanooga, Tennessee, for the Appellant, Internal Medicine Education Foundation, Inc.

John P. Konvalinka and J. Scott McDearman, Chattanooga, Tennessee, for the Appellee, Thomas M. Gautreaux.

## OPINION

### I.  BACKGROUND

In November 2007, pursuant to the Tennessee Public Records Act, Tenn. Code Ann. § 10-7-101 et seq., Thomas M. Gautreaux ("Mr. Gautreaux") tendered a written request for certain records to the Internal Medicine Education Foundation, Inc. ("IMEF"). Specifically, Mr. Gautreaux requested the following documents and materials:

---

[1]This action is related to the lengthy legal saga of Dr. Alexander Stratienko. The plaintiff is an employee of the law firm representing Dr. Stratienko.

All documents, materials and/or correspondence in your possession or control regarding, referencing, or pertaining in any way to any payments that the Internal Medicine Education Foundation, Inc. has received from or made to the Chattanooga-Hamilton County Hospital Authority, Mel Twiest, M.D., Van Stephen Monroe, Jr., M.D., Mitchell L. Mutter, M.D., Daniel F. Fisher, M.D., and/or Nita Shumaker, M.D., the Chattanooga Heart Institute, Cardiovascular Group, University Surgical Associates, University Orthopedics, Orthopedic Associates, Phillip Burns, Ronald Blankenbaker, B.W. Ruffner, Norm Desbiens, Galen Group, Cardiovascular Care Group, University of TN Physicians, and/or UT College of Medicine.

The following month, IMEF denied Mr. Gautreaux's request. Mark D. Anderson, M.D., responded for IMEF, declaring that the foundation is not a governmental agency and that its records do not constitute public records. IMEF did supply copies of its Form 990 informational returns filed with the Internal Revenue Service, redacted to remove information concerning the identification of donors to the foundation.

In January 2008, pursuant to Tenn. Code Ann. § 10-7-505 (Supp. 2008),[2] Mr. Gautreaux instituted this action in order to compel IMEF to act. He further obtained a show cause order that directed IMEF to immediately appear and show cause why the petition should not be granted. IMEF asserted improper service of process and moved to dismiss pursuant to Tenn. R. Civ. P. 12.02(5). An expedited hearing took place on February 20, 2008.[3]

Velma Hixson, the custodian of records for IMEF, testified at the hearing regarding IMEF:

This organization was founded by a group of doctors who are either on the active or voluntary clinical faculty for the Department of Medicine of the University of Tennessee Clinical Educational Center at Chattanooga, Tennessee, for the purposes of expanding the quality of medical education for intern and resident doctors in training at Baroness Erlanger Hospital, supplementing government funds for the purchasing of medical equipment for Baroness Erlanger Hospital and providing funds for medical research relating to internal medicine.

She summarized the work of IMEF as follows:

IMEF today is providing funds, raising funds in the ways that they can, to provide enhancements to the education of the residents by paying faculty in a couple of the programs. Also, to provide funds to send the residents to present research that they

_____

[2] As relates to this appeal, recent amendment did not make substantive change from prior version.

[3] The named physicians filed motions to intervene in the present action in order to voice their opposition to the disclosure of the requested materials. On February 17, 2008, the trial court ordered that the physicians were entitled to intervene for the limited purpose of addressing the issue of whether the requested records were privileged.

have performed.  They're only . . . paying the travel costs of allowing them to go to these meetings.

And they bring in grand round speakers to – who come in and speak after the physicians have rounded with their residents and seeing the patients, and they discuss items of interest to the Internal Medicine faculty and the interns and residents, and general public in some cases.

She noted further that "when they have the funds, they help in providing equipment or other services that . . . there might not be public funds available for."

Ms. Hixson further testified as follows on cross-examination:

Q       Okay.  Now, you said that IMEF was contributing or paying for some teaching.  By whom is that teaching done?

A       The teaching is done by faculty of the University at the College of Medicine.

Q       Okay.  And, right now, . . . is IMEF providing some funding for teaching by the UT College of Medicine?

A       That would be in the area of nephrology and oncology.

* * *

Q       . . . [T]hey would be paid for, supervising that patient care?

A       Yes.

Q       Now, who will pay them for that?

A       Medicare, Medicaid programs, TennCare, private insurance companies.

* * *

A       The independent contract that they sign with IMEF has them assigning those benefits for those services to the IMEF.

Q       Are they effectively making contributions to the work of IMEF through that benefit?

A       It is a way of contributing the funds back into the process.

* * *

Q    Okay. Now, please explain to the Court exactly what, under this contract, IMEF needed to arrange.

A    IMEF encouraged participation by UT College of Medicine faculty to participate in the education of the residents and making sure that there were approved contracts assigned by these physicians. And then gathering the documentation . . . the teaching physicians[ ] had to complete showing they had provided this teaching service. And then making payments to those physicians, which then, in turn, was reimbursed to the Medicine Foundation from the University of Tennessee College of Medicine.

Q    All right. Now, did, in any circumstance, . . . IMEF . . . select who could be on the faculty of the UT College of Medicine?

A    No.

Q    Did it indicate which residents were to be trained?

A    No.

Q    Did it establish the rate at which any of those UT College of Medicine faculty members would be paid?

A    No.

Q    Did it determine – did it supervise the teaching by those UT College of Medicine faculty members?

A    No.

Q    Did it tell those UT College faculty members what hours, what days they were to serve?

A    No.


Ms. Hixson additionally indicated that IMEF currently does no contractual work for the University of Tennessee College of Medicine. She related further:


Q    I believe you testified that IMEF today obtains or receives no funding from the Chattanooga - Hamilton County Hospital Authority [Erlanger]; it that correct?

A    That's correct.

Q       Does it receive today any funding from any local government?

A       No.

* * *

Q       Who are the members of IMEF?

A       The members are faculty of the UT College of Medicine.

Q       Are there any governmental officials that are members of IMEF?

A       No.

On redirect, Ms. Hixson admitted that the teaching contract revenue listed on the Form 990s exceeded 30 percent during the years IMEF contracted with the university.

In its Findings of Fact and Conclusions of Law issued two months later, the trial court ruled as follows:

> Because IMEF is a nonprofit corporation, the Tennessee Public Records Act does not apply unless petitioner can show that IMEF is the functional equivalent of a government entity. *Allen v. Day*, 213 S.W.3d 244 (Tenn. Ct. App. 2006).
>
> * * *
>
> 1. IMEF employs no full-time staff members. It contracts with Physicians Practice Resources for administrative services. The administrative services are personally provided by Velma Hixson, an employee of Physicians Practice Resources. Ms. Hixson spends an average of 15 hours per month doing work for IMEF. (Hixson)
>
> 2. According to its charter and amended charter, IMEF's stated purposes are to
>
>> receive and maintain a fund or funds of real or personal property, or both, and, subject to the restrictions and limitations herein set forth, to use and apply the whole or any part of the income therefrom and the principal thereof exclusively for charitable, scientific, literary or educational purposes, and in particular, to promote and develop an internal medicine education foundation to receive and make gifts and donations for the care, treatment and research of any and all internal medicine illnesses, diseases or problems, and to operate facilities and to otherwise provide care treatment and research for any and all internal medical illnesses, diseases, or problems, and in general to make any contributions to organizations that qualify as exempt

-5-

organizations under Section 501(c)(3) of the Internal Revenue Code and its Regulations as they now exist or as they may hereafter be amended.

To organize, develop, conduct, manage, administer, support and coordinate a faculty practice plan for the teaching physician faculty of the Department of Medicine of the University of Tennessee College of Medicine at the Chattanooga Unit ("UTCOM-CU").

To develop, support and enhance the delivery of teaching, academic, clinical and related services to, by and for the Department of Medicine and programs at the UTCOM-CU. (Exs. 2 and 8)

3. According to Form 990 Tax Returns, IMEF is "operated for the benefit of Erlanger Medical Center, Chattanooga, Tennessee and performs charitable services in the field of internal medicine for and in connection with Erlanger Medical Center." Its primary exempt service is "graduate medical education." It has "provided educational programs, research and support services for the internal medicine residency program." (Ex. 1)

4. IMEF contracted with the University of Tennessee College of Medicine to

arrange through contracts with individual physicians or physician groups, who are privileged as internists for: (1) teaching for the following services: allergy, cardiology, consultative medicine, dermatology, geriatrics, neurology, private office, rheumatology, and attending teaching services for residents in the University Internal Medicine Residency Program; (2) "on-call" staffing for the team and night float housestaff at Chattanooga-Hamilton County Hospital Authority d/b/a Erlanger Medical Center ("Erlanger"); and (3) certain administrative services for and on behalf of the Department of Internal Medicine (the "Department") (collectively, the "Services"). As used herein, "teaching services" shall include, but not be limited to: the supervision and teaching of residents; serving as preceptors to train and supervise residents who are participating in the specialty clinic, if applicable; training and supervision of residents who are participating in Contractor's private practice, if applicable; participation in the didactic component of resident training, as applicable; participation in resident training rounds, as applicable to rotation; and providing consults for service patients. As used herein, administrative services shall mean those services in support of the Department as agreed to between the Contractor and UTCOM-CU, such as chief resident services.

\* \* \*

-6-

(1)  Each physician utilized by Contractor shall hold a faculty appointment with the UTCOM-CU; . . .

(Exs. 3 and 4)

5.  In actual practice, the administrative services referred to in Paragraph 4 above consisted of facilitating contracting with faculty members to provide graduate medical education in the field of internal medicine for the benefit of the University of Tennessee College of Medicine, billing insurance companies and Medicare, TennCare, etc, for medical services provided to patients in the course of the faculty supervising residents, and processing records of the time spent by contracting faculty members in providing the services that were to be compensated by UTCOM.  All of the funds paid by UTCOM to IMEF each month went to pay faculty members and IMEF kept none of said funds.  IMEF had no role in selecting faculty members, setting compensation for the faculty members, directing what they teach, what hours they teach, or other terms of employment of the faculty members.

6.  IMEF does no work specifically for Erlanger Hospital, and does no work for UTCOM now.  UTCOM made the decision to handle the administrative services itself and does not provide funding to IMEF under the contracts now.  (Hixson)

7. IMEF now sends residents to meetings to present their research, brings in speakers to discuss items of interest to internal medicine faculty and residents, and supplements funding for faculty in the areas of oncology and nephrology.  (Hixson)

8.  IMEF receives no government grants or appropriations, but for the tax years ending June 30 of 2004, 2005 and 2006, it received substantial and significant sums for contractual services from the UTCOM.  The contractual services were those designated in paragraphs 4 and 5 above.  IMEF receives no funds from Erlanger Hospital.  (Ex. 1 and Hixson)

<u>Functional Equivalent of a Governmental Entity</u>

Initially, it appears that IMEF is exempt from disclosure of its records because it has no employees and the Tennessee Public Records Act does not apply to nonprofit corporations with two or less employees.  Tenn. Code Ann. § 10-7-503(d)(1)(F)(iv); *Fodness v. Newport and Cocke County Economic Development Commission, Inc.*, No. E2004-01491-COA-R3-CV, 2005 WL 607964, 2005 Tenn. App. LEXIS 148, Tenn. Ct. App., E.S., March 16, 2005.  However, in *Fodness*, the Court of Appeals found a duty to construe the Act liberally in favor of the fullest possible access to public records.  Relying upon guidance of the Tennessee Supreme Court in *Memphis Publishing v. Cherokee Children*, 87 S.W.3d 61 (Tenn. 2002), the Court of Appeals held that the Act requires public access to the records of an otherwise exempt nonprofit corporation "if it is the functional equivalent of a government agency."

Whether an entity is the functional equivalent of a public agency is a question of law to be determined from the totality of the circumstances. *Memphis Publishing*, 87 S.W.3d at 79. The Supreme Court, relying on statutes and case law from other jurisdictions, indicated that consideration might properly be given to (1) whether the entity performs a government function, (2) the level of government funding, (3) the extent of involvement or regulation by the government, (4) whether the entity was created by the government, (5) whether the entity is immune from tort liability, (6) commingling of funds, (7) whether the activity is conducted on publicly owned property, (8) whether the services performed are an integral part of the public agency's decision-making process, (9) whether the private entity is performing a function that a public agency would otherwise perform and (10) who benefits from the private entity. *Id.* at 77-78 citing *Connecticut Humane Soc'y v. Freedom of Info. Comm'n*, 218 Conn. 757, 591 A.2d 395 (1991); *A.S. Abell Pub'g Co. v. Mezzanote*, 297 Md. 26, 464 A.2d 1068 (1938); *News and Sun-Sentinel Co. v. Schwab, Twitty & Hanser Architectural Group*, 596 So. 2d 1029 (Fla. 1992).

In making a determination under the functional equivalency test, the Court is admonished that a

> private business does not open its records to public scrutiny merely by doing business with, or performing services on behalf of, state or municipal government. But when an entity assumes responsibility for providing public functions to such an extent that it becomes the functional equivalent of a government agency, the Tennessee Public Records Act guarantees that the entity is held accountable to the public for the performance of those functions.

*Memphis Publishing Co.*, 87 S.W.3d at 79.

In *Souder v. Health Partners, Inc.*, 997 S.W.2d 140 (Tenn. Ct. App. 1998), the Court was faced with the issue of whether the board of directors of a private non-profit corporation was a "public body" that was required to comply with the Open Meetings Act. Tenn. Code Ann. § 8-44-101 et seq. Noting that the term "public body" was not defined in the statute, the Court of Appeals quoted the holding in *Dorrier v. Dark*, 537 S.W.2d 888 (Tenn. 1976) at 892:

> It is clear that for the purpose of this Act, the Legislature intended to include any board, commission, committee, agency, authority or any other body, by whatever name, whose origin and authority may be traced to State, City or County legislative action and whose members have authority to make decisions or recommendations on policy or administration affecting the conduct of the business of the people in the government sector.

In determining that the Board of Directors of Health Partners, Inc. ("HP") was a "public body," the Court found pertinent that HP was a nonprofit corporation chartered as "a government instrumentality of the Jackson-Madison County General Hospital District." Its function is to further "the statutory mission of the (District) to make quality health care available to the public at reasonable costs." HP commingled funds with the District, allowed its bookkeeping to be handled by the District's accounting department, received $400,000 in seed capital and a $500,000 line of credit from the District, and the District appointed the members of HP's board. The Court concluded that HP was a subsidiary of the District and "that subsidiaries to which municipal corporations have delegated their official responsibilities and authority are subject to the Open Meetings Act." *Souder* at 148.

In this case, the Court deems an analysis similar to that used in *Souder* as an appropriate way to answer the threshold question. Education has been recognized as an essential government function. *Burnett v. City of Memphis*, 269 S.W.2d 906, 907 (Tenn. 1954). The University of Tennessee College of Medicine is a part of the University of Tennessee providing medical education. The University of Tennessee has been determined to be a governmental agency. *Byrd v. State*, 150 S.W.3d 414, 421 (Tenn. Ct. App. 2004) citing *Roberson v. Univ. of Tenn.*, 912 S.W.2d 746, 747-48 (Tenn. Ct. App. 1995).

In determining whether IMEF is the functional equivalent of a government entity, the Court finds as follows:

> (a) One of the primary purposes of IMEF set forth in its charter is "To develop, support and enhance the delivery of teaching, academic, clinical and related services to, by and for the Department of Medicine and programs at" University of Tennessee College of Medicine, Chattanooga Unit. The UTCOM is undoubtedly a government entity, and in providing the specified educational services, IMEF is performing a function that the UTCOM would otherwise perform.

> (b) IMEF provided administrative services related to computing appropriate compensation for certain members of the internal medicine faculty of the UTCOM. In performing the administrative services, IMEF performed a function that the UTCOM would otherwise have performed.

> (c) In performing administrative services under its contracts with UTCOM-CU, IMEF had no control over the selection of the internal medicine faculty members, their compensation, discipline, working conditions, and other terms of employment; such matters were controlled by UTCOM-CU.

(d) Compared to other sources of funding, in the tax years 2004, 2005 and 2006, IMEF received substantial and significant sums from the UTCOM-CU.

(e) IMEF currently supplements the cost of faculty to teach in the areas of oncology and nephrology, sends residents to meetings to present their research findings, and brings in speakers to discuss items of interest to internal medicine faculty and residents. These actions further and enhance the mission of the UTCOM-CU.

Conclusion

The Internal Medicine Education Foundation, Inc. performs a government function that a public agency would otherwise perform. It has received significant funding from a public entity that exercised control over the performance of IMEF. The IMEF functions for the benefit of the general public. The primary function and purpose of IMEF is to benefit the University of Tennessee College of Medicine, Chattanooga Unit, its faculty, resident physicians, and the patients served thereby. It is the opinion of the Court that IMEF is the functional equivalent of a public entity and subject to the Tennessee Public Records Act.

\* \* \*

The decision of the trial court constituted a final judgment on the merits, from which IMEF filed a timely appeal.

II. ISSUES

The issues presented are restated as follows:

A. Whether it was necessary for the trial court to expressly determine whether IMEF constituted an association or nonprofit corporation as defined in the Tennessee Open Meetings Act.

B. Whether the trial court correctly held that IMEF was the "functional equivalent" of a governmental entity and subject to the Tennessee Public Records Act.

C. Whether public policy supports the trial court's ruling that IMEF is subject to the disclosure requirements contained in the Tennessee Public Records Act.

## III. STANDARD OF REVIEW

On appeal, the factual findings of the trial court are accorded a presumption of correctness, and will not be overturned unless the evidence preponderates against them. *See* Tenn. R. App. P. 13(d). With respect to legal issues, this court's review is conducted under a pure de novo standard of review. *S. Constructors, Inc. v. Loudon County Bd. of Educ.*, 58 S.W.3d 706, 710 (Tenn. 2001).

This case requires an interpretation of the Tennessee Public Records Act. We must "ascertain and give effect to the legislative intent without restricting or expanding a statute's coverage beyond its intended scope." *Owens v. State*, 908 S.W.2d 923, 926 (Tenn. 1995). Issues involving construction of a statute and its application to facts involve questions of law. *Memphis Publ'g Co. v. Cherokee Children & Family Servs., Inc.*, 87 S.W.3d 67 (Tenn. 2002). Therefore, the trial court's resolution of these issues is not entitled to Tenn. R. App. P. 13(d)'s presumption of correctness on appeal. This court will review these issues de novo and reach our own independent conclusions regarding them. *King v. Pope*, 91 S.W.2d 314, 318 (Tenn. 2002).

## IV. DISCUSSION

The Tennessee Public Records Act governs the right of access to all public records. The Act "serves a crucial role in promoting accountability in government th[r]ough public oversight of governmental activity." *Memphis Publ'g*, 87 S.W.3d 67, 74 (Tenn. 2002). Prior case law in this state has utilized the statutory definition of public record found in Tenn. Code Ann. § 10-7-301(6) – "all documents . . . made or received pursuant to law or ordinance in connection with the transaction of official business by any governmental agency." Effective July 1, 2008, the Public Records Act defines "public record" within the Act itself as follows:

> As used in this part and title 8, chapter 4, part 6, "public record or records" or "state record or records" means all documents . . . made or received pursuant to law or ordinance or in connection with the transaction of official business by any governmental agency.

Tenn. Code Ann. § 10-7-503(a)(1) (Supp. 2008). A governmental entity is defined in Tenn. Code Ann. § 10-7-504(a)(16)(A)(i) (Supp. 2008) as "the state of Tennessee and any county, municipality, city, or other political subdivision of the state of Tennessee."

As noted in *Fodness v. Newport & Cocke County Economic Dev. Comm'n, Inc.*, No. E2004-01491-COA-R3-CV, 2005 WL 607964 (Tenn. Ct. App, E.S., Mar. 16, 2005),

> [i]n construing the Public Records Act, we are guided by the General Assembly's directive that the public records statutes are to be "broadly construed so as to give the fullest possible public access to public records." In deciding whether the records are subject to public disclosure we must be guided by the clear legislative policy favoring disclosure. Thus, unless it is clear that disclosure of a record or class of

-11-

records is excepted from disclosure, we must require disclosure even in the face of "serious countervailing considerations.

2005 WL 607964, at *2 (citations omitted).

IMEF contends that the trial court erred by failing to address the issue of whether IMEF was subject to the Public Records Act pursuant to Tenn. Code Ann. § 10-7-503(d)(1), which applies the Public Records Act to records of associations and nonprofit corporations as defined in Tenn. Code Ann. § 8-44-102(b)(1)(E)(i) of the Tennessee Open Meetings Act. IMEF claims it is not covered by the Open Meetings Act because it fails one or more of the three tests:

(a) it was not established for the benefit of local government officials or counties, cities, towns or other local governments;

(b) it does not receive dues, service fees, or any other income from local government officials or governments equal to at least thirty percent (30%) of its total annual income; and

(c) it was not authorized as of January 1, 1998 to obtain coverage for its employees in the Tennessee consolidated retirement system.

Tenn. Code Ann. § 8-44-102(b)(1)(E)(i) (2002). All three criteria outlined in the provision of the Open Meetings Act must be met for the Act to apply. IMEF asserts that because it does not meet the description in Tenn. Code Ann. § 8-44-102(b)(1)(E)(i), the express language of Tenn. Code Ann. § 10-7-503(d)(1) does not subject it to the provisions of the Public Records Act.

IMEF further argues that even if it were subject to the Open Meetings Act, the express exceptions from the Public Records Act set forth in Tenn. Code Ann. § 10-7-503(d) should be applied. The Public Records Act specifically provides that the records of a nonprofit corporation described in Tenn. Code Ann. § 8-44-102(b)(1)(E)(i) are not accessible to the public if either of two circumstances apply:

* The nonprofit employs two or fewer full-time staff members; or

* The nonprofit is exempt from federal income tax under section 501(c)(3) of the Internal Revenue Code and it makes available its Form 990 informational returns in accordance with the Internal Revenue Code and related regulations.

The trial court did not address whether IMEF is a nonprofit corporation described in Tenn. Code Ann. § 8-44-102(b)(1)(E)(i). However, it expressly found that IMEF met the requirements of the first of these two § 10-7-503(d) exceptions indicated above. The record reveals that IMEF also met

the second listed exception.[4]  Thus, IMEF contends the trial court erred in failing to give effect to the express statutory exceptions.

The trial court declined to apply the express statutory exceptions, relying on our analysis in *Fodness*.  In our *Fodness* decision, the majority[5] disregarded the statutory exception set out in Tenn. Code Ann. § 10-7-503(d)(1) upon concluding that the economic development commission set up by two adjoining counties was the "functional equivalent" of a governmental entity.  We relied upon the functional equivalency test announced by our Supreme Court in *Memphis Publ'g Co. v. Cherokee Children & Family Servs., Inc.,* 87 S.W.3d 67 (Tenn. 2002).

### *Memphis Publ'g Co. v. Cherokee Children & Family Servs., Inc.*

In *Memphis Publ'g*, the Tennessee Supreme Court determined that non-governmental private entities may be subject to the Public Records Act if the private entity's "relationship with the government is so extensive that the entity serves as the functional equivalent of a government agency."  *Id.* at 78-79.  With regard to its reasoning behind extending the scope of the Public Records Act to private institutions that constitute the functional equivalent of a government entity, the Court observed:

> private entities that perform public services on behalf of a government often do so as independent contractors.  Nonetheless, the public's fundamental right to scrutinize the performance of public services and the expenditure of public funds should not be subverted by government or by private entity merely because public duties have been delegated to an independent contractor.

*Memphis Publ'g*, 87 S.W.3d at 78.  The Court went on to state that the cornerstone of determining whether a private entity operates as the functional equivalent of a governmental agency and therefore subject to the Act is "whether and to what extent the entity performs a governmental or public function."  *Id.* at 79.  The Court listed several non-exhaustive factors that are relevant to the determination of whether an entity is the functional equivalent of a governmental agency:

(1)    the level of government funding of the entity;
(2)    the extent of government involvement with, regulation of, or control over the entity; and
(3)    whether the entity was created by an act of the legislature or previously determined by law to be open to public access.

---

[4]The trial court did not address the second express exemption from coverage contained in Tenn. Code Ann. § 10-7-503(d)(2), although the record established that IMEF qualified for it by being an organization exempt from federal taxation under § 501(c)(3) of the Internal Revenue Code and that IMEF made its Form 990 returns available in accordance with the Internal Revenue Code and related regulations.

[5]Judge Susano of this Panel issued a partial dissent in *Fodness*, stating that the specific language of § 10-7-503(d)(1) controlled the general language of § 10-7-503(a).

*Id.* Courts must balance the factors set out by the Supreme Court in *Memphis Publ'g* and must "look to the totality of the circumstances in each given case, and no single factor will be dispositive." *Id.* The Court cautioned, however, that public access was not allowed "to the records of every private entity which provides any specific, contracted-for services to governmental agencies." *Id.*

### *Fodness v. Newport & Cocke County Economic Dev. Comm'n, Inc.*

In *Fodness*, this court considered the exact issue raised by IMEF in this matter: whether a nonprofit corporation that fell within the scope of Tenn. Code Ann. § 10-7-503(d)(1) and performed its obligations under that provision in order to exempt itself from the disclosure requirements contained in § 10-7-503(a) was nevertheless obligated to produce public records if it constituted the functional equivalent of a government entity. 2005 WL 607964, at *3-6. The *Fodness* court noted that:

> The Supreme Court [in *Memphis Publ'g*] did not specifically refer to subsection (d) of the Public Records Act, presumably because the nonprofit corporation . . . was not a nonprofit corporation as defined by Tenn. Code Ann. § 8-44-102(a), but, rather, based its decision on subsection (a) which refers to "all state, county and municipal records." However, we believe the Supreme Court intended the functional equivalency analysis to be applied to *any* nonprofit corporation or association seeking to keep its records closed.

*Fodness*, 2005 WL 607964, at *6. The court commented further:

> We are persuaded that in light of our duty to construe the Tennessee Public Records Act liberally in favor of the fullest possible public access to public records and the guidance provided by our Supreme Court in *Memphis Publishing Co.*, that **we must make the functional equivalency determination** and, **even though the nonprofit corporation has complied with the audit exception**, its records are accessible to the public **if it is the functional equivalent of a governmental agency**. Its records will not be open to the public merely because it does business with or performs services on behalf of the Cocke County government or any municipal government. To hold otherwise would be to allow a nonprofit corporation or association as defined by Tenn. Code Ann. § 8-44-102(b)(1)(E)(i) to file an audit, or if it has less than two employees not file an audit, and close its record to the public even though it is providing the functionally equivalent services of a government agency. We do not believe the Supreme Court intended such a result by its comments in *Memphis Publishing Co.* As the Supreme Court emphasized in that case, the Public Records Act "serves a crucial role in promoting accountability in government through public oversight of governmental activities." *Memphis Publishing Co.*, 87 S.W.3d at 74.

*Id.*, 2005 WL 607964, at *6 (emphasis added).

Mr. Gautreaux argues that by applying the *Memphis Publ'g* factors, it is clear that IMEF is the functional equivalent of a governmental entity. He contends the proof shows that the stated purposes of the IMEF are:

a. To provide graduate medical education in conjunction with the University of Tennessee College of Medicine.

b. To provide educational programs, and research and support services for the internal medicine residency program at Erlanger Hospital in conjunction with the University of Tennessee College of Medicine.

c. To benefit Erlanger Medical Center.

d. To perform charitable services in the field of internal medicine for and in connection with the Erlanger Medical Center.

e. To arrange, on behalf of the University of Tennessee College of Medicine, teaching for the following services: allergy, cardiology, consultative medicine, dermatology, geriatrics, neurology, private office, rheumatology, and attending teaching services for residents in the University Internal Medicine Residency Program.

f. To arrange, on behalf of the University of Tennessee College of Medicine, "on call" staffing for the team night float house staff at Chattanooga-Hamilton County Hospital Authority, d/b/a Erlanger Medical Center ("Erlanger").

g. To arrange, on behalf of the University of Tennessee College of Medicine, certain administrative services for and on behalf of the Department of Internal Medicine.

h. To conduct, establish and support charitable, scientific or educational activities through the receipt of real or personal property.

i. To use funds received for charitable, scientific, literary or educational purposes, and in particular, to promote and develop an internal medicine education foundation to receive and make gifts and donations for the care, treatment and research of any and all internal medicine illnesses, diseases or problems, and to operate facilities and to otherwise provide care, treatment and research for any and all internal medical illnesses, diseases, or problems, and in general to make any contributions to organizations that qualify as exempt organizations.

-15-

> j. To organize, develop, conduct, manage, administer, support and coordinate a faculty practice plan for the teaching physician faculty of the Department of Medicine of the University of Tennessee College of Medicine at the Chattanooga Unit.
>
> k. To develop, support and enhance the delivery of teaching, academic, clinical and related services to, by and for the Department of Medicine and programs at the University of Tennessee College of Medicine at the Chattanooga Unit.

Mr. Gautreaux contends that performing and supplying education related services to and on behalf of the University of Tennessee College of Medicine and/or Erlanger Hospital constitutes traditional governmental functions. See *Barnett v. City of Memphis,* 269 S.W.2d 906, 907 (Tenn. 1954) ("The county, in the operation and maintenance of its schools, is engaged in a governmental function"). He further claims that IMEF's solicitation, receipt and use of charitable donations for the funding or benefit of teaching, academic, clinical and related services by and for the Department of Medicine and programs at the University of Tennessee College of Medicine constitutes an essential government function. See *State ex rel. Toledo Blade Co. v. Univ. of Toledo Found.*, 602 N.E.2d 1159, 1163 (Ohio 1992) (finding that a private, non-profit, foundation that obtained charitable donations, and used the same to support the programs of a public university was performing a government function); *Gannon v. Board of Regents*, 692 N.W.2d 31, 41 (Iowa 2005) (quoting *Toledo*, "[T]he solicitation and receipt of donations for the university, and keeping records of that activity, are government functions." *Id.* at 1163; accord *Boston v. Tanner*, 29 F.Supp.2d 743, 747 (W.D. La. 1998) (approving view that the power to "seek and accept donations . . . relate[s] strictly to [a] university's academic function")).

To the contrary, IMEF argues that nothing in *Memphis Publ'g* supports ignoring specific language contained in the Public Records Act addressing applicability and exception in favor of a judicially constructed "functional equivalent" test. IMEF contends that the nonprofit involved in the *Memphis Publ'g* case did not fall within any of the exceptions contained in Tenn. Code Ann. § 10-7-503(d), and that case, therefore, did not support the holding in *Fodness* that the "functional equivalency" test should be applied to bring back within the Public Records Act a private nonprofit corporation that the legislature expressly excluded from coverage. IMEF asserts that the majority in *Fodness* overlooked a fundamental rule of statutory interpretation that provides that the plain, clear, and unambiguous language of a statute will be applied as written by the legislature. *Walker v. Sunrise-Pontiac GMC Truck, Inc.*, 249 S.W.3d 301, 309 (Tenn. 2008). IMEF further contends that the trial court erred in determining that IMEF is the functional equivalent of a government entity. According to IMEF, because the legislative directives are clear, no consideration of the judicially-created "functional equivalent" test is necessary.

IMEF specifically asserts that there is no nexus between it and any governmental entity. It emphasizes the following factors:

\* The members of IMEF are physicians – and there are no governmental members. IMEF's charter clearly establishes it as a nonprofit foundation, not a "government instrumentality."

*       There is nothing in the record suggesting any commingling of IMEF funds with those of the university or any other governmental entity.

*       IMEF receives no government grants or appropriations.

*       IMEF charged the university nothing for the administrative services provided under the Administrative Services Contracts.

*       IMEF receives no funds from Erlanger.

*       Where IMEF contributes funding for teachers, it exerts no control over the educational approach. It does not tell the university faculty how to teach; has nothing to do with selecting the members of the faculty; has no role in setting the faculty members' compensation; has no role in deciding which residents are taught; and has no role in telling the faculty members when or what hours they are to teach. IMEF had no responsibility to administer or manage the teaching program.

IMEF's argument cannot be reconciled with the holding in *Memphis Publ'g*, or with this court's prior holding in *Fodness*. The legislature has clearly embraced the "functional equivalency" test in *Memphis Publ'g by* providing in the newly enacted provisions of Tenn. Code Ann. § 10-7-503(a)(6) that "[a] governmental entity is prohibited from avoiding its disclosure obligations by contractually delegating its responsibility to a private entity." Additionally, as to this court's decision in *Fodness*, the Attorney General has opined that

> [w]hile the opinion in *Fodness* is an unpublished opinion and, therefore, not controlling authority, it is considered persuasive authority. As such, we think that a court would engage in an analysis of the factors set forth in the *Memphis Publishing Co.* case to determine whether [an entity] is the functional equivalent of a governmental agency, even if it otherwise meets the statutory exception . . . .

Tenn. Op. Atty Gen. No. 07-170, 2007 WL 4800789 (Tenn. A.G.) (citation omitted). Thus, under the available authority, regardless of whether IMEF falls within the scope of Tenn. Code Ann. § 10-7-503(d)(1), it was appropriate for the trial court to apply the functional equivalency test to the evidence presented at the hearing. The record supports the conclusion of the trial court that IMEF constitutes the functional equivalent of a government entity and, therefore, is subject to the disclosure requirements contained in the Tennessee Public Records Act.

While IMEF argues that the records at issue are available from the university, that Mr. Gautreaux has already obtained the records, and that requiring the IMEF to produce the requested records would negatively impact other charitable entities, we find IMEF's contentions are unsupported by the record before us. The Public Records Act requires the production ordered by the trial court.

## V.  CONCLUSION

The judgment of the trial court is affirmed.  This case is remanded for collection of costs below.  Costs on appeal are taxed to Appellant, Internal Medicine Education Foundation.

_____
JOHN W. McCLARTY, JUDGE