IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
July 11, 2012 Session

## REBECCA LITTLE v. CITY OF CHATTANOOGA, TENNESSEE

**Appeal from the Chancery Court for Hamilton County**
**No. 11-0571      W. Frank Brown, III, Chancellor**

---

**No. E2011-027-24-COA-R3-CV-FILED-SEPTEMBER 25, 2012**

---

This action involves requests made by the appellant pursuant to the Tennessee Public Records Act, Tennessee Code Annotated sections 10-7-501, et seq. and 6-51-108(b), to the appellee city. After not receiving access to certain records to which she felt entitled, the appellant filed this petition. The trial court ruled that the city never refused to disclose the records but it just had not done much as of the time the petition was filed. However, because appellant did not prove that the city acted in bad faith as a result of its slowness in producing the public record requested the appellant was denied an award of attorney's fees for the filing of the petition. We reverse the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court
Reversed; Case Remanded**

JOHN W. MCCLARTY, J., delivered the opinion of the Court, in which CHARLES D. SUSANO, JR., and D. MICHAEL SWINEY, JJ., joined.

John R. Anderson and Mark W. Litchford, Chattanooga, Tennessee, for the appellant, Rebecca Little.

Phillip A. Noblett and Keith J. Reisman, Chattanooga, Tennessee, for the appellee, City of Chattanooga, Tennessee.

**OPINION**

**I. BACKGROUND**

The appellant, Rebecca Little ("Little") lives in a section of the City of Chattanooga ("the City") known as "Area 12." The City adversely annexed Area 12 in 1972. According

to Little, the City represented to the Tennessee Supreme Court in *Hicks v. City of Chattanooga*, 513 S.W.2d 780 (Tenn. 1974), that it would provide certain services to Area 12 within a specific period of time. In order to ascertain the City's progress, Little requested records from the City related to the development of services in Area 12 since annexation. She argued records regarding the progress of services are required to be published annually to the public pursuant to Tennessee Code Annotated section 6-51-108(b).[1]

In the *Hicks* decision, the City adopted an ordinance to annex territory located in Tiftonia, including Area 12, and to deliver a plan of services within a specific period of time. The Supreme Court ruled that the City's annexation was reasonable. *Id.* at 782. The *Hicks* Court reviewed the trial court's memorandum opinion as follows:

> [I]t was shown by the city that the areas in question had no fire protection comparable to what the city could offer (and ultimately a lowering of insurance rates), that the city could provide better police protection, and that the schools would have available more funds, with a smaller teacher-pupil ratio, that the health of these areas was endangered due to percolation problems with regard to septic tanks and that the county had never provided sanitary sewers, whereas the city could, that the county does not provide refuse and garbage collection, no[r] recreational facilities, nor street lighting, nor traffic engineering, nor certain inspection services, which services could and would be provided by the city. Further, that the vast majority of the people in the proposed areas work in the city, that their economic opportunities were provided by the city, that recreational facilities were provided and could be better provided by the city, that the airport was provided by the city, that cultural advantages were provided by the city and utilized by county residents and that it was necessary and right that the tax burden for all such services be equitably distributed. It was shown that the city was financially able to and would provide the usual municipal services in accordance with the schedule of services, or before the dates scheduled.

*Id.*

---

[1] Tennessee Code Annotated section 6-51-108(b)(2011), relating to the rights of residents of annexed territory, states as follows:

> [T]here shall be prepared and published in a newspaper of general circulation in the municipality a report of the progress made in the preceding year toward extension of services according to such plan, and any changes proposed therein.

Tenn. Code Ann. § 6-51-108(b).

Little made her requests pursuant to the Tennessee Public Records Act, Tennessee Code Annotated section 10-7-501 et seq. Tennessee Code Annotated section 10-7-503 provides, in relevant part, as follows:

**10-7-503. Records open to public inspection – Schedule of reasonable charges – Costs.** – (a)(1) As used in this part and title 8, chapter 4, part 6, "public record or records" or "state record or records" means all documents, papers, letters, maps, books, photographs, microfilms, electronic data processing files and output, films, sound recordings or other material, regardless of physical form or characteristics, made or received pursuant to law or ordinance or in connection with the transaction of official business by any governmental agency.

(2)(A)  All state, county and municipal records shall, at all times during business hours . . . be open for personal inspection by any citizen of this state, and those in charge of the records shall not refuse such right of inspection to any citizen, unless otherwise provided by state law.

(B)  The custodian of a public record or the custodian's designee shall promptly make available for inspection any public record not specifically exempt from disclosure. In the event it is not practicable for the record to be promptly available for inspection, the custodian shall, within seven (7) business days:

(i)  Make the information available to the requestor;

(ii) Deny the request in writing or by completing a records request response form developed by the office of open records counsel. The response shall include the basis for the denial; or

(iii) Furnish the requestor a completed records request response form developed by the office of open records counsel stating the time reasonably necessary to produce the record or information.

(3) Failure to respond to the request as described in subdivision (a)(2) shall constitute a denial and the person making the request shall have the right to bring an action as provided in § 10-7-505.

(4) This section shall not be construed as requiring a governmental entity or public official to sort through files to compile information; however, a person

requesting the information shall be allowed to inspect the nonexempt records.

(5) This section shall not be construed as requiring a governmental entity or public official to create a record that does not exist; however, the redaction of confidential information from a public record or electronic database shall not constitute a new record.

* * *

(7)(A) . . .

(B) Any request for inspection or copying of a public record shall be sufficiently detailed to enable the records custodian to identify the specific records to be located or copied.

Tenn. Code Ann. § 10-7-503(a)(1) - (7)(B) (Supp. 2010).

On June 7, 2011, Little submitted six requests. All of the requests sought information regarding the development of sanitary sewer systems in the area annexed in 1972. Four of the requests were virtually identical. For example, one request read as follows:

All documents, reports, maps, diagrams, charts, drawings, blue-prints, papers, information, studies, letters, records, emails, electronic data processing files or other like materials pertaining to the development, growth, advancement, installation, delivery, placement, or construction of sanitary sewers in the territory identified and designated as Area 12 on Map B-B in Resolution No. 9166, dated January 25, 1972 and adopted by the City of Chattanooga in Ordinance No. 6393, dated February 2, 1972, *from 2003 to 2011.*

(Emphasis added.). The only difference between this request and three others were the different time periods for which the documents were sought – "from 1993 to 2002," "from 1983 to 1992," and "from 1973 to 1982." The two remaining requests sought a subset of records requested in the first four requests ("pertaining to, connected to, discussing or describing in any manner any and all plans for sanitary sewers in the annexed area" and "identifying all parcels or tracts located in the territory" known as Area 12). Little described the last two requests as asking for documents identifying parcels that had a sewer installed and "when that sewer was installed" along with "all documents (emails, notes, letters, studies, etc.) discussing or describing in any manner any and all plans for sanitary sewers over that period of time."

-4-

Janina Muller is the City employee who handled the open records requests at the time of Little's inquiry. In regard to the June 7, 2011 requests, Muller testified that the City initially believed Little had made the same request six times. In fact, Muller wrote Little on June 10, observing that it appeared the six requests "seem to be the exact[ ] same request." Muller also forwarded Little's request to Mike Patrick, the Waste Resources Systems Engineer, and Jerry Stewart, Patrick's immediate supervisor, stating in her email that the six requests "appear to be only 1 request and [Little] made 6 different copies." Later on June 10, Little responded to Muller's email to explain the differences between the six separate requests.

On June 16, Muller sent Little an email requesting appropriate key terms to search email files. That same day, Little emailed Muller the following response: "From the information you have given me, I also now know that I need to be more specific in my inquiry. I think I will be able to better convey that specificity after a visit." Thereafter, Muller received some records from Patrick, which she produced to Little on June 21. According to Little, only one document – identified as the 30th Annual Report on the operation of Sanitary and Interceptor Sewer System for the City of Chattanooga ("30th Annual Report"), dated October 1982 – and engineering sewer plans for three sewer contracts from 1982 to 1993, were provided to her. Little noted that the 30th Annual Report indicated such a report was published by the City annually. Thus, on June 22, Little emailed Muller, advising her that the June 7 request had sought all of the annual reports but that the City had only produced one.[2]

Little subsequently submitted another request on June 30, limited to a specific geographical area of Area 12 (O'Grady, Burgess, and Browns Ferry roads) relative to only four City services – roads, storm sewer, parks, and sanitary sewer. She requested financial records pertaining to sewer services to be provided pursuant to Contracts 79, 64B, and 64C. Little gave the request to Cathy Watts, Muller's open records request backup.

The first page of the request read as follows:

All documents, reports, maps, diagrams, charts, drawings, blue-prints, papers, plans, information, studies, letters, records, emails, electronic data processing files or other like material pertaining to, connected to, discussing or describing in any manner all plans for sanitary sewers in the annexed area identified and designated Area 12 (on Map B-B in Resolution No. 9166, dated January 25, 1972 and adopted by the City of Chattanooga in Ordinance No. 6393, dated

[2]It appears that the City ultimately produced 19 of a possible 39 sewer annual reports. Little received no annual reports related to the other services about which she inquired.

February 2, 1972) related to sewer contracts identified by the City as Contracts 79, 64B and 64C. . . . Since 2001?[3]

The June 30 request continued onto a second page where Little requested documents: "identifying roads, street lighting and sidewalks" and "pertaining to the development, growth, advancement, installation, delivery, placement, or construction of storm sewers" "North of I-24 on Browns Ferry Road, Burgess Road and O'Grady Drive since 1972" in Area 12; and "identifying parks and recreational services" located North of I-24 in Area 12.

When Little did not receive a confirmation from Muller of receipt of the June 30 request, she inquired of Muller about it by email on July 7. In that email inquiry, Little attached what she stated was a copy of her June 30 request. However, according to the City, she sent an attachment that differed from her edited June 30 request, as it sought the production of items previously provided in response to the June 7 request.

Muller testified that she does not recall when she actually received the June 30 request, as she was studying for a bar examination and was not working full time. During the time frame at issue, Muller apparently worked on a reduced schedule and took days off between June 29 and July 28, 2011, to study.

Muller admitted that as of the time she received Little's July 7 email, she had not forwarded the June 30 request out to the City departments because she "thought it looked like the previous one." Muller was out of the office on July 7, and did not respond to Little's email until the next day, at which time she called Little, told her she was processing the request, and indicated the documents should be made available in seven business days. Muller subsequently sent out emails to the departments she thought would have the records. She specifically wrote Steve Leach (Public Works Administrator), Lee Norris (supervisor of Stewart and who reports to Leach), and Patrick. As forwarded in the email, the attached request was sent as two separate documents with the first page being in one document and the second page being in a second document rather than a single two-page document.

In Leach's reply to Muller, he informed her that he was not familiar with the requests, "so [he] guessed [his] staff was handling it." According to Muller, she interpreted this response to mean Leach's staff would send the records over. Muller stated that she did not send a copy of the June 30 request to anyone in the Parks and Recreation Department, as she thought the June 30 request was similar to the June 7 request and only involved Public Works. Muller recalled that on July 13, she again sent a copy of the June 30 request to Leach to remind him of the deadline for the records request.

_____

[3]The reference to 2001 appears to relate to the request for additional sewer annual reports.

When she did not receive any response to her June 30 request, on July 26, Little filed a petition for access to the requested records pursuant to Tennessee Code Annotated section 10-7-505. After Leach learned of the petition, he sent an email to Deputy City Attorney Phil Noblett asking if there was any way to seek an injunction against Little:[4]

> I assume her motive is harassment of the staff in order to prove that she should be let out of the City. Is there any legal basis or precedent for the Judge to limit her request to something that is reasonable or that is not in essence a duplication of material she has already seen. At some point in my humble opinion this is pure and simple harassment of the staff and again in my opinion goes beyond the purpose and intent of the legislation. Is there any case law that would go to that point and would grant some affirmative/injunctive relief.

Noblett responded as follows:

> She and John Anderson still have her lawsuit demanding deannexation due to her lack of sewer services.[5] She has been using the open records act as a quick way to obtain discovery for her other lawsuit. John Anderson has been in the wings the whole time on this matter. We just need to make sure we have not let something fall into the cracks from these open records requests and we should be fine.

Subsequent to this email, Leach instructed his staff to search for records in "[a]ll of Area 12," despite the fact that Little's last request was narrowed down to information relative to three roads located in the annexed area.

A show cause hearing commenced on August 4, 2011. Boxes were brought to the hearing purportedly containing documents responsive to Little's requests. The City asserted: "[W]e brought all of that stuff to the extent we know it's responsive" and "[w]e've given them everything we got. We don't know what else we can turn over."

Little noted that the City did not disclose to the trial court that it had failed to produce any requested emails. Immediately after the hearing, Little received an email from Muller asking for "key terms" so the City could search for responsive emails. On August 11, Muller again emailed Little and advised that the City could not conduct an email search without

---

[4]Leach testified that he had dealt with Little "on a piece of property out in Lookout Valley, a hundred acres [on which] she was running a bed and breakfast and . . . a meeting center in that area."

[5]Little's father, James P. Little, M.D., had filed an action against the City on May 23, 2011.

specific key terms being provided by Little. On August 15, Little informed Muller by email that the key terms for the search were the descriptive words provided in the June 30 request. Further, she opined to Muller that the City was in a better position to identify effective key terms than she was. When the City eventually conducted an email search on August 15, the terms contained in the June 30 request were utilized.

On August 18, Little told the trial court that the City had not produced any records relative to Contract 79 or any emails dated prior to June 2006. She claimed that approximately 75 percent of the documents provided to her had not been responsive to her requests. Little further noted that she had received correspondence from the City Attorney's office that any search for emails would be limited to the period between June 30, 2011, and June 30, 2006. According to Little, Noblett had informed her that the search was limited due to the fact the City had adopted, pursuant to Tennessee Code Annotated section 10-7-702, the recommendations of the Municipal Technical Advisory Service ("MTAS") contained in its *Records Management for Municipal Governments Guide* ("the MTAS guide"). In regard to emails, the MTAS guide required the City retain them for a period of five years. Therefore, per Noblett, irrespective of whether the City actually had emails older than five years, the City was not going to search for them because of the provisions in the MTAS guide.

Over the course of the hearings conducted in this matter, City employees who gathered the responsive documents appeared before the trial court. Leach related that he supervises five divisions and that the entire Public Works Department is his responsibility. His immediate office maintains the records relating to sewer lines and maps. Leach testified that when he received the June 30 request, he glanced through it and determined that it looked like the same request Little had made before. He missed the second page of the request that had been attached to the July 7 email forwarded to him by Muller. He admitted that it was his "oversight." Leach stated that he did not become aware of the fact the request was different until after Little filed her lawsuit. According to Leach, when he learned of the different request, he sent emails to his staff to provide the information as quickly as possible. He contended that materials responsive to the June 30 request were brought to the courthouse on August 4 for review and copying by Little. Leach also testified that his staff looked for Contract 79 and the additional annual reports requested by Little. He observed that Public Works does not prepare annual reports.

Patrick, a sewer department employee, testified that he provided the sewer line maps in response to Little's initial requests. According to Patrick, he conducted a search for Contract 79, but could find not find such a document. He indicated that he had no explanation for why the sewer contract numbers stop at number 77 and then pick back up at number 81. At the first hearing, Patrick expressed his belief that he had provided all

responsive records required of him with the exception of one document - a preliminary engineering report to serve the Little property, which he proffered to the court. However, three days before his August 25 testimony, Patrick noted he had since located four rudimentary sketches on his computer responsive to Little's request. According to Patrick, the sketches had been made several years before and he had forgotten about them.

Deborah Mikel, the Information Technology Manager for Public Works, related that her department consists of traffic engineering, traffic operations, Moccasin Bend Wastewater Treatment Plant, citywide services, in addition to water quality and engineering. According to Mikel, she is the person normally requested to gather information contained on computers relating to maps and documents maintained by Public Works. She noted that if a file was in paper form, they took the documents and made copies, and if the file was in electronic form, they ran reports that consolidated all the information. At the hearing, she identified maps relating to capital road projects, storm water, solid waste, and sewer pipes that had been produced. She related that materials pertaining to the City's 311 system, water quality, and job orders maintained from before the current electronic system also had been produced. Mikel testified that she and other Public Works employees worked a total of 142 hours before the August 4 hearing to locate and copy documents they felt were responsive to Little's requests. On the day of her testimony, Mikel brought to court additional documents, consisting of records from Public Works' central file, including correspondence, other materials relating to Burgess Road, O'Grady Drive, and Browns Ferry Road, and additional work orders.

Dennis Malone, Assistant City Engineer, testified that in response to Little's request, he gathered documents relating to the capital projects in Area 12 – major road work and widening of roads and sanitary sewer installations. Malone estimated that the overall staff time spent conducting searches on Little's requests was around one hundred hours. Malone admitted that he first saw the June 30 request on August 1. He testified that it was his understanding that the request related to all of Area 12. According to Malone, even after he read the June 30 request himself, he still thought it sought documents relating to all of Area 12, and he did not learn until the day before his testimony that the request was limited to only three roads.

Lawrence Zehnder, Parks and Recreation Administrator, testified that he had provided copies of a document showing all the City's facilities, buildings and structures, and parks, and which outlined the various components of the City's parks and recreation system. The material produced identified the parks and the John A. Patten Recreational Center in the annexed area. Zehnder related that the City has spent money on parks in the Tiftonia area in the past 30 years and there should be documents to reflect what was spent on these projects. He admitted he had not produced the plans concerning the construction of John A.

Patten Recreational Center because Little's request was "about where our facilities are located and what services are provided to the citizens." Interestingly, Zehnder observed, "There may be a warehouse somewhere where records are, but I don't know where that might be." In discussing the warehouse comment, Zehnder related that while it was possible that material responsive to the June 30 request might be in storage, he does not know of it and his staff has no knowledge of it. He noted that neither he nor his staff looked in a warehouse kept by the City because "[t]here was no reason, no suggestion that there even was any material there." He described the warehouse as more or less a junk room.

Leanne Tinker testified that she works for the City as the Deputy CIO of the Information Services Department and acts as the director of technology, supervising and managing the systems and network departments. Tinker explained that key terms and people's names are needed to make email searches because of the mass amount of electronic information available. According to Tinker, having the terms and names makes the search "easier and more efficient to get the information you're looking for." She stated the requestor normally is asked to produce the key terms and names for the search. Tinker related that due to hardware and software constraints, the City maintains emails for five years pursuant to the MTAS guide. The media is then "used over."

Steve Faulkner stated that he works as the Support Services Manager for the Information Services Department, which handles the technology needs for approximately 15 City departments including the Microsoft Exchange electronic mailing system. Faulkner recalled that he had been asked by the City Attorney's Office to perform searches on the Microsoft Exchange server. He explained that in order to perform searches of email records, one needs some type of search criteria to look for terms inside the email or in the headers of the email. He related that he further needs to be told in which mailboxes to search and some date parameters.

According to Faulkner, Noblett gave him a list of seven mailboxes and key terms and he was asked to search for all emails dated from July 30, 2006, to the present containing those terms in all seven mailboxes. He searched the mailboxes of Leach, Norris, Patrick, Bill Payne, Stewart, John Van Winkle, and Zehnder looking for the terms "Tiftonia," "Browns Ferry Road," "Burgess Road," "O'Grady Drive," "James Little," "Rebecca Little" and "3104 Scenic Water Lane." He located 755 emails, some of which had attachments. Little was allowed to review the retrieved emails on a computer provided for her use containing Microsoft Outlook. Faulkner noted that a second email search was later performed at the request of the trial court. The second search sought emails prior to July 30, 2006, in the same mail boxes using the same key terms. Faulkner related that he located 46 additional emails, some of which had attachments.

On August 25, the trial court communicated with counsel as follows: "If you want to brief the issues, please do so on or before 9/20." Little filed her written closing argument on September 20. The City filed its written closing argument and brief on September 21. Thereafter, at the hearing that same day, counsel for Little asked the court to disregard the City's brief due to the late filing. Because an issue existed at the hearing's conclusion concerning two CDs that had been identified during the hearing, Little's counsel agreed to respond regarding the admissibility of the CDs by September 26. However, the CDs were inaccessible and unreadable, thus making it impossible to review what they contained in order to raise objections prior to September 26. On September 30, Little's counsel addressed the evidentiary issues with the court. Notwithstanding the limited purpose of the correspondence, counsel reargued matters outside the issue of the admissibility of the CDs.

On October 11, 2011, the trial court entered a memorandum opinion and order that denied Little's request to recover attorney's fees from the City, denied the City's request that Little reimburse the City for the costs of two CDs the City had provided her, denied Little's request to exclude the City's written closing argument and brief, and ordered that the clerk's cost be adjudged against the City. The trial court specifically noted as follows:

> ***Based upon the evidence, the City has not claimed that anything sought by Ms. Little was not a public record.*** The City never refused to disclose the records. They just had not done much as of the time the Petition was filed. The City produced a plethora of records at the August 4, 2011 hearing and has produced additional public records after August 4, 2011.

> \* \* \*

> ***The court holds that Ms. Little has not proved that the City of Chattanooga acted in bad faith as a result of its slowness in producing the public records requested.*** The City has never asserted that the documents requested by Ms. Little were not public records. Although slow and intermittent, the City has never refused to produce the records. Indeed, the City apparently produced more records than requested, especially on the roads request.

> The court cannot impute bad faith because of slowness or negligence. There were three primary problems that led to the delay. The first was Ms. Little's request. It appeared similar to her first request June 7, 2011 and the City was still in the process of responding to Ms. Little's request when the second request was submitted by Ms. Little on June 30, 2011. There may well be some duplication with regards to the sanitary sewers. The second problem was Ms. Muller's studying for the Tennessee bar exam and missing so much work

in July. Third, Ms. Watts did not see and/or pick up the request and take over as anticipated. The "ball" was dropped.

Thus, based upon (1) the legal standard set forth in *Greer [v. City of Memphis, Tennessee*, 356 S.W.3d 917(Tenn. Ct. App. 2010)] and other cases cited, (2) the far better facts for the City of Chattanooga in this case compared to *Greer*, (3) the court's finding that the City did not act in bad faith, and the (4) limited nature of the award, ***the court denies Ms. Little's request to be awarded attorney's fees from the City of Chattanooga in connection with her requests of June 30, 2011.***

(Emphasis added.).

On November 9, 2011, Little filed a motion to (1) alter and/or amend the court's order, and/or (2) alternatively, reconsider the court's finding and order. Little's motion requested that the court "(1) render a final order relative to the issue of whether the City has produced all of the documents, and (2) render a finding that the City acted willfully in refusing to produce all of its documents, thus entitling Rebecca Little to attorneys' fees in this proceeding." Additionally, Little argued that the "Court erred in accepting the City's late filed brief." A hearing was held on November 21.

On December 7, the trial court entered a memorandum opinion and final order in which it amended the October 11 order to reflect that Ms. Little did not receive all of the information she wanted from Chattanooga, reaffirmed the memorandum opinion and order in all other respects, and ordered that the clerk's cost for that motion be adjudged against Little. The trial court noted as to alleged "not produced" documents, one document, sewer contract 79, could not be found by City, additional documents Little sought relating to parks and recreation were not encompassed by her request, and if Little was dissatisfied with the City's response, she could have submitted more specific requests for additional documents. The court held that it would not rule that the City had failed to produce documents it was required to produce. In the memorandum opinion and final order filed on December 7, 2011, the trial court specifically provided as follows:

Because of the post-judgment arguments and contentions, the court has reviewed the public records statutes as an effort to study the issues raised by counsel. The public records statu[t]es have been amended over the years since the court's last in-depth review of them.

First, there are several interesting provisions that are found in the statutes that were not cited by the court in the October 11, 2011 Opinion. One, Tenn. Code

Ann. § 10-7-503(a)(4) (Supp. 2011) provides:

> This section shall not be construed as requiring a governmental entity or public official to sort through files to compile information; however, a person requesting the information shall be allowed to inspect the nonexempt records.

This statute seems to support Chattanooga's frustration with Ms. Little's public records requests, most of which have been pretty far reaching or less than clear about specific documents. However, the statute also seems to indicate that Ms. Little, for example, could spend her time at one or more of Chattanooga's offices and inspect non-exempt records to find anything she wanted to study or to copy. Such could lead to success but it would be on her time and not the time of Chattanooga's employees.

Two, Tenn. Code Ann. § 10-7-503(a)(5) (Supp. 2011) provides:

> This section shall not be construed as requiring a governmental entity or public official to create a record that does not exist. . . .

Mr. Patrick testified that he could not find sewer contract number 79. Trial Exhibit 41. Thus, it appears that Ms. Little has at least two alternatives. First, she could use the specific information she has about any payments made pursuant to or on Contract 79 as a basis for a public records request and thus try to find additional information about Contract 79. Second, if the court has read correctly about her personal right to inspect records, she could go to the appropriate Public Works' office and go through files and look for Contract 79 or any change in contract numbers. The document may, or may not, be identified by another name.

Three, Tenn. Code Ann. § 10-7-503(a)(7)(B) (Supp. 2011) provides that:

> Any request for inspection and copying of a public record shall be sufficiently detailed to enable the records custodian to identify the specific records to be located or copied.

This statute appears to be in line with § 10-7-503(a)(4) (Supp. 2011).

There is no doubt that obtaining public records by direct request to the

government can be faster and less expensive than formal discovery in litigation. However, in view of some of the statutory restrictions found in the public records laws, it may be better for the purposes of Dr. Little's case that discovery, pursuant to the Tennessee Rules of Civil Procedure, be attempted. Such discovery can be more open ended.

In all honesty, Ms. Little's June 7 public records [requests] were pretty broad and far reaching. . . .

* * *

Four other requests that were a part of Ms. Little's first public requests are identical, except for the dates covering the records sought. The sixth listed request calls for all plans for sanitary sewers in Area 12 from 1972 to 2011. The court in the first opinion compared the first June 7 request with her first request on June 30, 2011.

Ms. Little's first request, in her June 30, 2011 request was essentially the same as the June 7 request but narrowed the scope of the records at the end of the request to Contracts 79, 64B and 64C. Her other three requests covered records from 1972 to the present.

Ms. Little's requests do appear to require a sorting through of files to compile the requested records. If so, then such requests are improper and invalid under Tenn. Code Ann. § 10-7-503(a)(4) (Supp. 2011) quoted above.

Second, the court did not try to punish Ms. Little for her attorney's long letter of September 30, 2011 or not calling Mr. Noblett as a witness. The court cited the letter for an example of waiver and/or briefing an old issue after September 20, 2011. If Ms. Little can submit letter-briefs/arguments after September 20, 2011, then the court should be able to consider Chattanooga's brief submitted on September 21, 2011, nine days earlier than Ms. Little's legal arguments.

The court did not allow Chattanooga to recover its production fees from Ms. Little. Had the court wanted to punish her, then she would have been ordered to pay the reproduction costs.

In the practice of law, older lawyers often see examples of the life lesson called "what goes around comes around" applied. If Ms. Little's attorneys had acceded to the court's qualms about Ms. Little's calling attorney Noblett to the

-14-

witness stand, then it seems old fashioned, common courtesy to have advised Mr. Noblett of such fact in order that attorney Elliott would not have been present during the hearing on September 21, 2011. Perhaps even worse, Mr. Elliott sat through the entire proceeding during the afternoon of September 21, 2011. It always saddens the court when zealous representation and/or a lawyer's personal identification with a client's cause results in the legal issues becoming "personal." Civility is a goal to be attained by judges and attorneys. The attorneys for both sides got a little testy at times. In the long run, people often get more by honey and sugar instead of vinegar and other noxious liquids. The court acknowledges that at times "hard ball" tactics are necessary.

There was some discussion at trial and in the post-judgment papers about whether Tenn. Code Ann. § 6-51-108(b) applied to a 1972 ordinance and 1974 annexation. Ms. Little thought it did and used such and *State ex rel. Cain v. City of Church Hill*, No. E2007-00700-COA-R3-CV, 2008 WL 4415579 (Tenn. Ct. App. 2008) to argue that Chattanooga had not complied with the law. As stated above, the Public Records statutes do not require a government to make records that do not exist. Thus, § 6-51-108(b) has no relevance to Ms. Little's action. If Chattanooga failed to make records of its progress in meeting the plan of services adopted for an annexed area, if required by state law, then this fact would probably have more relevance and effect in her father's lawsuit than in this one.

Also, the attorneys have spent more time on Chattanooga's policy of automatically reusing computer data after five years. Thus, according to Chattanooga, all emails are erased or disappear when new emails are created, which is to occur after five years. Ms. Little contends a few emails were still available that were more than five (5) years old. Chattanooga relies on Tenn. Code Ann. § 10-7-702[6] as authority for its policy of retaining emails for only five years. Chattanooga's policy is based upon the policy recommendations of the municipal technical advisory services ("MTAS"). Ms. Little agreed that the MTAS'[s] recommendation for retention of emails was five years. In a public records request, the court suggests that Chattanooga not limit its time reference to five years but determine what is discovered without regard to date just in case an email older than five years old still exists. State statutes must

---

[6] 10-7-702. Retention schedules. – (a) The municipal technical advisory service, a unit of the Institute for Public Service of the University of Tennessee, is authorized to compile and print, in cooperation with the state library and archives, records retention manuals which shall be used as guides by municipal officials in establishing retention schedules for all records created by municipal governments in the state.

be construed together in order to determine the intent of the general assembly. To the court's knowledge, there is nothing in the Public Records law which mandates that governmental units maintain[] all "public records" for eternity.

(Emphasis added.). Little timely filed this appeal.


## II. ISSUES

We restate the issues raised by Little as follows:

1.     Whether the trial court correctly applied the legal standards applicable to attorney fee awards in public records cases.

2.     Whether the trial court abused its discretion when it found that no attorney's fee award was appropriate in this case.

3.     Whether the trial court abused its discretion by accepting the city's closing argument brief.

4.     Whether the trial court properly denied Little's motion to alter or amend to require production of all responsive documents requested by Little.


## III. STANDARD OF REVIEW

On appeal, the factual findings of the trial court are accorded a presumption of correctness, and will not be overturned unless the evidence preponderates against them. See Tenn. R. App. P. 13(d). With respect to legal issues, this court's review should be conducted under a pure de novo standard of review. *Southern Constructors, Inc. v. Loudon Cty. Bd. of Educ.*, 58 S.W.3d 706, 710 (Tenn. 2001). Mixed questions of law and fact are reviewed de novo with no presumption of correctness. *State v. Thacker*, 164 S.W.3d 208, 248 (Tenn. 2005). However, appellate courts have "great latitude to determine whether findings as to mixed questions of fact and law made by the trial court are sustained by probative evidence on appeal." *Aaron v. Aaron*, 909 S.W.2d 408, 410 (Tenn. 1995).

## IV. DISCUSSION

Tennessee Code Annotated section 10-7-503 establishes a broad right of public access to governmental records:

All state, county and municipal records shall, at all times, during business hours, be open for personal inspection by any citizen of Tennessee, and those in charge of such records shall not refuse such right of inspection to any citizen, unless otherwise provided by state law.

Tenn. Code Ann. § 10-7-503(a)(2)(A). *See Memphis Publ'g Co. v. City of Memphis*, 871 S.W.2d 681, 684 (Tenn. 1994). The Court has emphasized the legislative mandate to "interpret the terms of the Act liberally to enforce the public interest in open access to the records of state, county and municipal governmental entities." *Memphis Publ'g Co. v. Cherokee Children & Family Servs., Inc.*, 87 S.W.3d 67, 74 (Tenn. 2002) (noting that "the Act serves a crucial role in promoting accountability in government through public oversight of governmental activities.").

Tennessee Code Annotated section 10-7-503(a)(2)(B) provides:

The custodian of a public record or the custodian's designee shall promptly make available for inspection any public record not specifically exempt from disclosure. In the event it is not practicable for the record to be promptly available for inspection, the custodian shall, within seven (7) business days:

(i) Make the information available to the requestor;

(ii) Deny the request in writing or by completing a records response form developed by the office of open records counsel. The response shall include the basis for the denial; or

(iii) Furnish the requestor a completed records request response form developed by the office of open records counsel stating the time reasonably necessary to produce the records or information.

Tennessee Code Annotated section 10-7-503(a)((3) provides that "[f]ailure to respond to the request as described in subdivision (a)(2) shall constitute a denial and the person making the request shall have the right to bring an action as provided in § 10-7-505."

Tennessee Code Annotated section 10-7-505 outlines the process to obtain judicial

review of actions taken to deny access to any public record. Subsection (d) of that statute instructs the courts that: " . . . this section shall be broadly construed so as to give the fullest possible public access to public records."

Tennessee Code Annotated section 10-7-505(g) provides:

If the court finds that the governmental entity, or agent thereof, refusing to disclose a record, knew that such record was public and willfully refused to disclose it, such court may, in its discretion, assess all reasonable costs involved in obtaining the record, including reasonable attorneys' fees, against the nondisclosing governmental entity.

## A.

The City does not deny that it failed to promptly respond to Little's June 30, request within seven business days as required by statute. It argues, however, that it did not act willfully or with bad faith. The City has the burden of proving that it was justified in not producing all of the responsive records. Tenn. Code Ann. § 10-7-505(c). There is no dispute that the records sought are public, subject to disclosure under the Public Records Act.

Again, pursuant to subsection (a)(2)(B), "[t]he custodian of a public record or the custodian's designee shall promptly make available for inspection any public record not specifically exempt from disclosure. In the event it is not practicable for the record to be promptly available for inspection, the custodian shall, within seven (7) business days:

(i) Make the information available to the requestor;

(ii) Deny the request in writing or by completing a records request response form developed by the office of open records counsel. The response shall include the basis for the denial; or

(iii) Furnish the requestor a completed records request response form developed by the office of the open records counsel stating the time reasonably necessary to produce the record or information.

"Failure to respond to the request as described in subdivision (a)(2) shall constitute a denial . . . ." Tenn. Code Ann. § 10-7-503(a)(3). The City clearly did not respond to the request of Little as described in subdivision (a)(2). Thus, the actions of the City "constitute[d] a denial" of access to the City records requested. Thereafter, Little properly brought her action

-18-

pursuant to Tennessee Code Annotated section 10-7-505.

In *Contemporary Media, Inc. v. City of Memphis*, No. 02A01-9807-CH00211, 1999 WL 292264 (Tenn. Ct. App. May 11, 1999), we observed that "[n]ot every refusal to disclose is wrongful. The statute expressed a 'knowing and willful' standard which is synonymous with 'bad faith.'"[7] *Id.* at *3. The *Contemporary Media* court, citing Black's Law Dictionary 127 (5th ed. 1979), defined "bad faith," in part, as follows: "[A] neglect or refusal to fulfill some duty . . . not prompted by an honest mistake as to one's rights or duties, but by some interested . . . motive . . . ." *Contemporary Media*, 1999 WL 292264, at *4.

The relevant question is whether the City's lack of production pursuant to the statutory provision was knowing and willful. We find that it was.

As noted by the trial court, the City knew the records sought were public and subject to disclosure. We find that the evidence also reveals that the City did not "fulfill its duty" to timely provide the records to Little because officials felt she was improperly using the Public Records Act provisions to obtain discovery for another lawsuit brought by her father. Indeed, Leach requested that the legal counsel for the City seek an injunction so that production to Little would not be required. Further, the City's reliance on the August 4 "in court" production is misplaced, because "[t]he question [at issue] is whether, at the time of refusal, the City knew the record was public and willfully refused to disclose it." *The Tennessean v. City of Lebanon*, No. M2002-02078-COA-R3-CV, 2004 WL 290705, at *7, n. 5. Related to the "in court" production, we observe the City improperly represented to the trial court on August 4 that all documents had been produced when it knew the search for the responsive emails had not even been initiated. Thus, at the time the records were not disclosed, the City knew it was obligated to produce and willfully did not. Accordingly, the City has failed to carry its burden with respect to the Public Records Act.

Tennessee Code Annotated section 10-7-505(g) provides:

> If the court finds that the governmental entity, or agent thereof, refusing to disclose a record, knew that such record was public and willfully refused to disclose it, such court may, *in its discretion*, assess all reasonable costs involved in obtaining the record, including reasonable attorneys' fees, against the nondisclosing governmental entity.

---

[7]Some hold the view in opposition to "inserting [the 'bad faith'] element into the statutory standard," as not "consistent with the Act or the purpose of the attorney fee provision." *See, e.g., The Tennessean v. City of Lebanon*, No. M2002-02078-COA-R3-CV, 2004 WL 290705, at *9, n. 9 (Tenn. Ct. App. Feb. 13, 2004).

Tenn. Code Ann. § 10-7-505(g) (emphasis added). In *Nashville Post Co. v. Tennessee Educ. Lottery Corp.*, M2006-01863-COA-R3-CV, 2007 WL 3072778 (Tenn. Ct. App. Oct. 22, 2007), we stated as follows:

> As the language of the attorneys' fee provision makes clear, there is another step in the fee award analysis. Even if the trial court makes a finding of knowledge and willfulness, the statute does not require the trial court to award attorneys' fees. If the trial court makes such a finding, Tenn. Code Ann. § 10-7-505(g) provides the trial court "may, in its discretion" assess costs and fees. The decision whether or not to assess fees, after the threshold requirement is met, is still within the trial court's discretion and is therefore subject to an abuse of discretion standard of review on appeal. *Memphis Publishing Co. v. Cherokee Children & Family*, 87 S.W.3d 67, 80 n. 15 (Tenn. 2002).
>
> A trial court abuses its discretion when it applies an incorrect legal standard, or reaches a decision which is against logic or reasoning that causes an injustice to the party complaining. *Williams v. Baptist Memorial Hospital*, 193 S.W.3d 545, 551 (Tenn. 2006); *Eldridge v. Eldridge*, 42 S.W.3d 82, 85 (Tenn. 2001). So long as reasonable minds can disagree as to the propriety of a decision, a trial court's discretionary decision will be upheld. *Eldridge*, 42 S.W.3d at 85. The abuse of discretion standard does not allow the appellate court to substitute its judgment for that of the trial court. *Williams*, 193 S.W.3d at 551.

*Nashville Post Co.*, 2007 WL 3072778, at *3.

An award of attorney's fees pursuant to Tennessee Code Annotated section 10-7-505(g) is within the discretion of the trial court. The court's decision will not be reversed or altered unless there has been an abuse of that discretion. *See Memphis Publ'g Co. v. Cherokee Children & Family Servs., Inc.*, 87 S.W.3d 67, 80 n. 15 (Tenn. 2002); *Threadgill v. Threadgill*, 740 S.W.2d 419, 426 (Tenn. Ct. App. 1987) ("The trial court is vested with wide discretion in matters of the allowance of attorney's fees, and this court will not interfere except upon a showing of an abuse of that discretion.").

The trial court abused its discretion when it did not award fees to Little. The court did not apply the statute properly. It appears the court focused on the amount of documents produced, especially those brought into court, rather than on whether the proper procedure was followed or the withholding was justified. As we noted above, reliance on what the City brought to the hearings is misplaced. The record supports the conclusion that the City acted consciously to withhold the records with a dishonest purpose. Little complied with the

-20-

Public Records provisions; to fulfill the purpose of the Public Records Act – "to give the fullest possible public access to public records" – Little must be compensated for having to expend time and money to enforce her right to access.

**B.**

Little argues the court should not have considered the City's written closing argument and brief because it was late.

The trial court decided to consider the City's written closing argument and brief for the reasons stated in its memorandum:

> One, the case was not ready for submission to the court on September 21, 2011, as the court has anticipated. The two CDs introduced by the City on September 21, 2011 were marked for ID. Ms. Little wanted to review the CDs before agreeing that the CDs could be admitted into evidence. Two, the court told the attorneys that it would receive any argument they had on whether Ms. Little should pay the City for the cost of the CDs. Counsel for Ms. Little used the opportunity to present a four page letter that went beyond the simple question. The merits of Ms. Little's position were presented in this letter dated September 30, 2011. This is somewhat like the *Arnold* case in that a position was weakened and, in effect, waived by submitting legal arguments on the merits after September 20, 2011. Therefore, the court decided to consider the City's Written Closing Argument and Brief filed at noon on September 21, 2011 in order to consider each party's arguments and authorities.

Little argues that it was an abuse of discretion for the trial court to waive its own requirement as to when the final argument briefs were to be filed. She contends that by the court allowing the City to file its brief on September 21, she was prejudiced because the final brief contained "factual inaccuracies and Little was prevented from submitting any rebuttal argument."

We do not find that the trial court's consideration of the City's September 21 brief was an abuse of discretion. The record reveals that Little had ample opportunities after the acceptance of the City's final argument brief to argue her position.

-21-

## C.

Little asserts that the City failed to produce a substantial number of identified responsive records to her June 30 request. She states the missing documents include: (1) emails for the City's top administrative officers; (2) financial records relative to sanitary sewer Contract 79; (3) financial records, drawings, and plans of recreational facilities: (4) drawings or financial records relative to storm sewers on O'Grady, Burgess, and Browns-Ferry roads.

At this stage of the process, the City is fully cognizant of what records Little is seeking from it. The City is directed to work with Little to identify any additional documents it has that will satisfy her requests. As noted by the trial court in its final order, the City should allow Little to visit its offices "and inspect non-exempt records to find anything she want[s] to study or copy . . . on her time and not the time of Chattanooga's employees." In regard to Contract 79, we agree with the trial court that Little should "go to the appropriate Public Works' office and go through files and look for Contract 79 . . . The document may, or may not, be identified by another name." Little must not make requests that require a "sorting through of files to compile the requested records," as such inquiries are improper pursuant to Tennessee Code Annotated section 10-7-503(a)(4). We further agree with the trial court's admonition to the City to "not limit its time reference" in a public records search.

## V. CONCLUSION

The judgment of the trial court is reversed. The case is remanded for a determination of the amount of attorney fees to be awarded and for other proceedings consistent with this opinion. Costs on appeal are taxed to the appellee, City of Chattanooga.

_____
JOHN W. McCLARTY, JUDGE